STATE *ex rel* JOHN LITTLE, *et al vs.* H. A. LANGLIE, *et al.*

Opinion filed June 10th, 1896.

### Mandamus—County Seat Controversy.

Where there is no other adequate and speedy remedy to test the validity of an election held to relocate a county seat, *mandamus* to compel the county officers to hold their offices at the legal county seat is the proper remedy to determine whether the county seat has been legally changed.

### Concurrent Remedy.

The statutory remedy by contest in the courts provided for by sections 1494, 1498, both inclusive, Comp. Laws, while an adequate and speedy remedy, and for that reason a remedy that would have precluded a resort to *mandamus* after the statute creating the remedy by contest was passed, had the remedy by *mandamus* not been perpetuated by statute, yet the remedy by *mandamus* was in fact perpetuated by section 1499, Comp. Laws.

### Notice of Election for Relocation—Validity.

The statute relating to elections for relocation of county seats provided that, if an election was ordered, it should be the duty of the board of county commissioners, in the notices for the next general election, to notify the voters of the county to designate upon their ballots at such election the place of their choice. The notice actually given was that an election would be held for the purpose, among others, "of voting upon the question of relocating the county seat of Traill County." At the election 1,882 votes were cast on this question, and the highest number of ballots cast at such election was 1960. *Held*, that the notice was sufficient, and that, even if insufficient, the election was not void, it appearing that the voters were not misled by the defect in it.

### Two-Thirds of the Votes Polled—Meaning.

The statute made it necessary that some one place should have "two-thirds of the votes polled" to work a change of the county seat to such place. *Held*, that this meant two-thirds of the votes polled on that particular question, and not two-thirds of the highest number of votes polled on some other question at the same election.

### Sufficiency of Petition—Determination of County Board Final.

After a county seat election has been ordered and held, and a sufficient vote is cast in favor of some one place to work a relocation of the county seat, the question whether the petition presented to the board of county commissioners praying that such an election be held was signed by a sufficient number of voters is not open to judicial investigation, when the board has found that it was so signed.

Appeal from District Court, Traill County; *McConnell*, J.

Application by the state, on the relation of John Little and

others, against H. A. Langlie and others, for *mandamus.* From an order denying a peremptory writ, relators appeal.

Affirmed.

*Crum & Hanson,* for appellants.
*Carmody & Leslie,* for respondents.

CORLISS, J. The appeal is from a final order in special proceedings. The order denied the relator's application for a peremptory writ of *mandamus.* The ostensible object of the proceeding was to compel the defendants, who held various offices in Traill County, in this state, to remove their several offices from Hillsboro to Caledonia, which was at one time the county seat of that county, and which is still the county seat thereof unless such county seat has been lawfully relocated at Hillsboro. It is therefore evident that the real purpose of the relators who are taxpayers in and residents of Traill County, is to settle the question whether there has been a legal change of the county seat of that county from Caledonia to Hillsboro.

It is first urged by respondents that *mandamus* is not the proper remedy. On that point we are clear that the law is settled against their contention. *County Seat of Linn Co.,* 15 Kan. 500; *Bennett v. Hetherington,* 41 Iowa, 142; *Ellis v. Karl,* 7 Neb. 381; *State v. Stockwell,* 7 Kan. 98; *Todd v. Rustad,* (Minn.) 46 N. W. 73; *Calaveras Co. v. Brockway,* 30 Cal. 325; *State v. Commissioners of Hamilton Co.,* 35 Kan. 640, 11 Pac. 902; *State v. Weld,* (Minn.) 40 N. W. 561; *State v. Saxton,* 11 Wis. 27; *State v. Avery,* 14 Wis. 122; *State v. Burton,* (Kan. Sup.) 27 Pac. 141; High, Extr. Rem. § 79; Merrill, Mand. § 125; 2 High, Inj. § 1257.

But it is urged that *mandamus* will not lie because there is another adequate and speedy remedy. We are referred to sections 1494-1498, Comp. Laws, which provide that the validity of a county seat election may be contested in the courts by pursuing the proceedings specified in these sections. We agree with counsel that this remedy is both adequate and speedy, but the same act which created this new remedy in terms perpetuated the

existing remedy of *mandamus* in such cases.   Section 11 of this act (chapter 54, Laws 1885) being section 1499, Comp. Laws, provides that "this act shall not be construed to affect any of the remedies or rights of action or proceedings provided for in the Code of Civil Procedure."   *Mandamus* is one of such remedies. As it could be employed, before the act of 1885 was passed, to try the validity of a county seat election, it can still be resorted to for such purpose; for this is the explicit declaration of section 1499.   That any taxpaper and resident could apply for the writ in the name of the state is not open to question in this state. *State* v. *Carey*, 2 N. D. 36, 49 N. W. 164.

It is claimed that Hillsboro did not receive the necessary statutory vote to make it the county seat.   Section 565, Comp. Laws, under which defendants seek to sustain the validity of the election, provides that if, upon canvassing the vote so given, it shall appear that any one place "has two-thirds of the votes polled," such place shall be the county seat.   It is undisputed that Hillsboro did in fact receive two-thirds of all the votes polled on the specific question as to the relocation of the county seat, and it is also uncontroverted that it did not receive two-thirds of all votes cast at the same election; the question being voted on at the general election, at which, of course, state and county officers were voted for.   The highest number of votes cast for any one officer at this election was 1,960.   Hillsboro received 1,291 votes, or less than two-thirds of 1,960.   In our opinion the vote for Hillsboro was sufficient.   The plain meaning of the statute is that the place having two-thirds of the votes polled on the particular question of relocation shall be the county seat.   There is nothing in the statute indicating that, to work a change of the county seat, any one place must receive the votes of two-thirds of all the voters of the county.   Ample authority supports our decision.   *Armour Bros. Banking Co.* v. *Commissioners of Finney Co.*, 41 Fed. 321; *Commissioners* v. *Winkley*, 29 Kan. 36; *Gillespie* v. *Palmer*, 20 Wis. 572; *Sanford* v. *Prentice*, 28 Wis. 358; *State* v. *Echols*, (Kan. Sup.) 20 Pac. 523.   The case of

*State* v. *Anderson*, (Neb.) 42 N. W. 421, supports the contention of appellants' counsel. Many authorities are cited by him to sustain his contention that, to work a relocation of the county seat, under section 565, to Hillsboro, that place must have received two-thirds of all the votes cast at the election. But an examination of these cases will disclose the fact that the language of the constitutional and statutory provisions there construed was radically different from that of our statute. In those cases there was no room for construction. There was a plain statement in the law that, to carry the measure before the people, or to relocate the county seat, a majority of the electors or voters of the county or city or town must vote in favor of it. *State* v. *Winkelmeir*, 35 Mo. 103; *People* v. *Wiant*, 48 Ill. 263; *People* v. *Brown*, 11 Ill. 479; *State* v. *Babcock*, 17 Neb. 188; 22 N. W. 372; *Enyart* v. *Trustees*, 25 Ohio St. 618; *Everett* v. *Smith*, 22 Minn. 53; *Taylor* v. *Taylor*, 10 Minn. 107 (Gil. 81;) *Bayard* v. *Klinge*, 16 Minn. 249 (Gil. 221.) When a majority of the electors is spoken of, the highest number of votes cast at the election must furnish the standard for determining whether the particular measure which must have such a majority has been carried. When 1,000 votes are cast at an election, and the particular measure which must receive the votes of a majority of the electors has in its favor only 400 votes, it is obvious that it has not received the vote of the majority of such electors, although there be no votes whatever against it. But our statute contains no such language. It carefully excludes the idea that two-thirds of the electors must vote for a place to make it the county seat. When speaking of the number of signatures to the petition required, it in terms declares that such petition shall be signed by two-thirds of the qualified voters of the county. But when it specifies the vote necessary to relocate the county seat at another place, it studiously avoids the use of this explicit language which is very appropriate to express the idea that appellant's counsel contends is to be found in the statute. To our minds this fact is very significant. It discloses a purpose to avoid making it necessary

that there should be a two-thirds vote of the electors of the county in favor of one place to change the county seat to such place. The language which is employed makes it apparent that the two-thirds vote required is a two-thirds vote on the particular question of the relocation of the county seat. The statute declares that, in the notice for the next general election, the voters are to be notified to designate upon their ballots the place of their choice. Then the statute continues, "And if upon canvassing the votes so given it shall appear that any one place has two-thirds of the votes polled such place shall be the county seat." The "votes so given" are the votes upon this particular question. If, upon the canvass of such votes, without any reference to any other vote at the same general election, it appears that any one place has two-thirds of the vote polled, it shall be the county seat. The "vote polled" is the vote polled upon that question. That is the only matter the statute is dealing with. It is utterly unjustifiable to assume that by these words the legislature meant the highest vote polled at the same election, no matter for what office or measure. The statute does not say "the highest vote polled at the same election for any office or measure," and we have no right to interpolate these words into the statute by construction. The general policy of the American people is to test the sufficiency of any vote by the vote on the particular question, and not by the vote on some other question. Unless the language is free from doubt, we have no right to spell out of the statute by a farfetched inference a purpose to depart from this general policy. It is to be observed that, whenever the lawmaking power of a state has desired to make the highest vote at the same election the standard, it has said so in unambiguous terms, as by requiring that there shall be a majority or two-thirds or three-fifths vote, as the case may be, of all the voters or electors of the city, town, or county, or by using equally explicit language.

It is next insisted that the election was void for the reason that the notice of election was not strictly in conformity with the

statute. The statute declares that, if the board orders an election, it shall be its duty to notify the voters, in the general election notices, to designate upon their ballots at the election the place of their choice. Section 565, Comp. Laws. The portion of the notices actually given reads as follows: "Also, to vote upon the question of relocating the county seat of Traill County." This notice was a substantial compliance with the statute. It distinctly informed the voters that that question was to be voted upon, and a reference to the law would disclose the fact that each voter might, and must to make his ballot count, designate on it the place he desired to vote for as county seat. This was done by all who voted on the question, and it appears that, while the highest number of votes cast for any one office was 1,960, there was 1,882 votes cast for different places for county seat. It does not admit of doubt that the voters of Traill County were fully apprised, by the notice actually given, of the question to be voted upon, and how they should vote upon it. We recognize the greater importance of a strict compliance with the provisions of law as to notice where a special matter is to be voted upon at a general election, or some officer is to be voted for to fill a vacancy, when, but for such vacancy, there would have been no vote for a candidate for such office at the general election, or when a special election is held, as to the time and place of holding which the laws of the state furnish no notice, than where there is an election of officers at a general election whose terms of office expire under the law, so that the public have notice of such election from the statutes of the state without further notice. See *Adsit* v. *Secretary of State*, (Mich.) 48 N. W. 31-33. The rule is that if no notice of a special election, or that a special matter will be voted for at a general election, is given, and there is an inference from the vote cast that the failure to give the required notice has so operated to the prejudice of the voters that it cannot be said that there has been a fair election held with respect to the special matter, then the election to that extent is void. But as we observed before, it is conclusively shown by

the vote on the question of relocating the county seat, in the light of the vote cast at the same time for county and state officers, that no possible injury to the voters resulted from the failure strictly to comply with the requrements of the law. As sustaining our ruling that the defect in the notice did not affect the validity of the election, see *Wheat* v. *Smith*, (Ark.) 7 S. W. 161; *State* v. *Carroll*, (R. I.) 24 Atl. 106; *Seymour* v. *City of Tacoma*, (Wash.) 33 Pac. 1059; *Ellis* v. *Karl*, 7 Neb. 381; *State* v. *Skirving*, (Neb.) 27 N. W. 723; *Dishon* v. *Smith*, 10 Iowa, 212; *Adsit* v. *Secretary of State*, (Mich.) 48 N. W. 31; *State* v. *Lansing*, (Neb.) 64 N. .W. 1104. We also think that there was such a substantial compliance with the statute as to the notice to be given that we would hold the election valid although it appeared that there was a much lighter vote on the question of relocating the county seat than for candidates for office voted for at the same election.

The only other attack on the election proceedings made by the appellants relates to the number of signatures to the petition presented·to the board of county commissioners requesting that the question of relocating the county seat be submitted to the voters of the county. The statute in terms requires that the petition be signed by two-thirds of the qualified voters of the county. The petition presented to the board and upon it 864 names. There is no finding of the court that these did not constitute two-thirds of the voters of the county; nor, on the other hand, is there any finding that they did. There is a finding that the board found "that said petition was signed by the necessary number of voters and electors of said Traill County." The records of the proceedings of the board do not disclose the fact that such a finding was made in terms by the board, but it is obvious that the board must be held to have reached such a conclusion from the mere fact that they ordered the election. See *Commissioners* v. *Hall*, 70 Ind. 469. We do not think that, after an election has been held, and a sufficient vote has been cast in favor of a place to work a change of the county seat to

such place, the question whether the petition had upon it the requisite number of names is open to judicial investigation. While a sufficient petition is undoubtedly necessary, yet the question lies deeper than that. What body is to settle this matter finally? This is the pregnant inquiry. When we consider the nature of the question to be passed upon, the peculiar facilities that county commissioners living in close contact with the people have for reaching a correct result, and the enormous expense involved in a trial of that question in court, we are impelled to the conclusion that the decision of the board is final; at least, after an election is had which demonstrates that the requisite number of voters were in favor of a change. In the case before us it appears that the voters of Traill County were almost unanimous in their desire for a change, Caledonia receiving only 218 votes out of 1,882 votes cast on that issue. The board is to receive the petition, is to pass upon its sufficiency, and is to order the election if satisfied that it is sufficient. Here is a clear submission of this question of fact to the board for adjudication. The statute contemplates that the board is to settle it one way or the other. No other body is given jurisdiction over the matter. It is left to the judgment of the board, to the end that the taxpayers shall not be burdened with the expense of an election unless there is a strong sentiment in favor of a change, and also to the end that, when there is a sufficiently widespread desire for a relocation to justify the expectation that the vote on the subject will accomplish something, and not prove futile, the citizens of the county may enjoy the right to vote on this issue. We think such a question may be safely left to the final decision of the county commissioners of a county. They are elected for a short term. They stand close to the people, and under such circumstances an abuse of the power is not to be expected. If the power is abused, the attempt of the board will prove abortive, if the voters do not desire a change. The only consequence of their wrongful action will be the expense of the election, so far as it relates to the special matter, which will be trifling, in view

of the fact that the question is to be voted on at the general election, and in addition the increased excitement of the election owing to the additional issue before the voters for settlement. These consequences are trivial as compared with the evils flowing from the doctrine that the question whether two-thirds of the voters signed the petition is open to investigation after two-thirds of the voters have declared in favor of a change of the county seat to another place, and so open to investigation for all time.

It is to be kept in mind that, if this matter can be inquired into in the courts, the issue of fact is not settled by a reference to the poll list, as the question is not with respect to the number of voters at the time of any election, but at the time the petition is presented. Where two-thirds of the electors must vote for a measure, it is obvious that the votes cast at the election will be controlling as to the number of the electors. But the number of votes cast at any election is not and cannot be absolutely controlling as to the number of votes at another time. This may be *prima facie* evidence as to the number of qualified voters at a given time, but the investigation may and will probe deeper. It will always relate—First, to the question of the exact number of qualified voters in the county, and this involves inquiries into the original citizenship, residence, naturalization, and age of each and every voter in the county; and, second, to the same inquiry with respect to the persons whose names are upon the petition, and the additional fact whether the signatures are genuine. An exhaustive trial of these complicated facts in court would in a single instance involve the expenditure of thousands of dollars, and would occupy the attention of the courts for months. The expense would be enormous as compared with the slight additional expense to the county from ordering an election on the question of relocating the county seat, and it would have to be borne by the innocent public officers who, in changing their place of holding their public offices, would be acting in obedience to the will of the people, as expressed at an election on the

subject, apparently regular and legal in all respects. Is it possible that, years after an election is had at which the people have spoken as decisively in favor of a change as in the case at bar, the whole subject is open to review in the courts, and that the question where the legal county seat is located may, after such a lapse of time, be made to turn on the issue of fact whether a certain person was 21 years of age at the time the petition was signed, or whether at that time he had resided long enough in a certain precinct or in the county or in the state to make him a legal voter, or whether at that time he was a citizen? If so, then the county seat of a county may be adjudged to be in another place than that at which the people by a decisive vote have located it, years after such location, by proving that a single person was only 20 years and 300 days old when the petition was presented to the board, or that he had lived in the county only 5 months and 25 days, or in the state 11 months and 25 days, at the time of the presentation of the petition to the county commissioners for action thereon. It is evident, too, that after the lapse of even a short period of time it will often become impossible to show that the petition was signed by a sufficient number of voters, although such was the fact. Suppose the petition in the case before us had been just sufficient, on the theory that every signature was that of a voter, and suppose that, on being apprised of the fact that there were doubts as to the age of one of the signers of the petition, and the board had investigated the fact, and had become satisfied that he was 21 years of age; how intolerable would be the doctrine that, nothwithstanding such investigation and decision by the board, such question of fact could be re-examined at any time, with the result of overthrowing, years afterwards, the clearly expressed will of the voters! We must assume, in cases of this kind, as in all other cases, that the board has done its duty, and has made a proper investigation. In our judgment, their conclusion as to the fact whether the petition has a sufficient number of names of voters upon it is final after the election has taken place. Able courts have taken

the same view of the law. *Currie* v. *Paulson*, (Minn.) 45 N. W. 854; *Ellis* v. *Karl*, 7 Neb. 381; *Bennett* v. *Hetherington*, 41 Iowa, 142; *Baker* v. *Supervisors*, 40 Iowa, 226; 2 High, Inj. § § 1257, 1258. In *Currie* v. *Paulson*, Judge Mitchell, speaking for the court, places the doctrine we enunciate in this case upon a solid foundation. The question before the court in that case was whether there was a sufficient number of signatures of voters upon the petition. The court held that, in a contest of the validity of a county seat election under the statute, this question was not open to investigation. In his opinion Judge Mitchell says: "In the very nature of things, the determination of the board on this matter must be final and conclusive. It was certainly not contemplated, and contestants do not claim, that the court, upon contest, could proceed on new evidence to try *de novo* the question as to the genuineness of signatures or the qualification of the signers; for, if so, the election might be held void, although the county commissioners decided rightly upon the evidence before them. If the court is to review the determination of the commissioners at all, it must be by attempting to put itself in their place, and consider how they ought to have decided upon the evidence which they had before them. But the law makes no provisions for preserving this evidence, or making up any record of it. If, as will often be the case, the evidence is oral, there is no possible way of ascertaining what the evidence before the board was. This difficulty is illustrated by the present case, in which the trial judge assumes to find what certain witnesses swore to before the board. There are manifest reasons why the determination of the board of commissioners as to these facts should be final. It is the vote of the electors at the election, and not the signatures to the petition, which determines the location of the county seat. The main, if not sole, purpose of requiring the petition in favor of a change before ordering an election is to save the public from the expense, loss of time, and excitement incident to such an election, unless there is a reasonable probability that the required majority of electors will vote

for the change. To go back of the action of the county board, and reverse their determination as to these facts, after the election is past, and the change carried by the popular vote, would certainly subserve no good purpose."

In *Edmonds* v. *Herbrandson*, 2 N. D. 270, 50 N. W. 970, the validity of this same county seat election was involved. But this question arose on demurrer. The plaintiff in that case alleged, and the allegation was admitted by defendants' demurrer, that Hillsboro did not receive two-thirds of the votes cast for county seat, but did receive a sufficient vote to make it the county seat under chapter 56, Laws 1890. The only question discussed in that case was whether that statute was valid. The trial court held it was, and sustained the demurrer. We came to the contrary conclusion, and reversed the judgment of the District Court. But it appears that the defendants admitted the fact that Hillsboro had not received two-thirds of the votes cast merely for the purpose of settling the constitutionality of the act of 1890. After the case had gone back to the District Court an answer was interposed, and this fact was put in issue by such answer. A question of fact is not settled by a tentative admission of it for a special purpose. It is only when judgment is entered upon the basis of such a fact that it is no longer open to controversy. Had there been judgment entered in that case by the District Court in favor of the plaintiffs on the demurrer, the matter would be *res adjudicata*. No such judgment was rendered. On the contrary, a judgment in favor of the defendants was subsequently entered, and this judgment appears from the record in this case to have been founded on the finding by the court that Hillsboro had in fact received the necessary two-thirds vote. But, even if it had not been founded upon such fact, but on a wrong theory of the law, it would be conclusive between the parties to such action, on the issue whether Hillsboro was the legal county seat, until reversed or set aside. It is possible we might legally rest our decision in this case on the conclusive force of the judgment in the case referred to, as there is much force in the contention that

there is privity between the parties to that action and the parties to this proceeding, particularly in view of the fact that only public interests were then litigated, and the same public interests is herein involved. But we prefer to meet the issues in the case before us on the merits, to the end that citizens of the county may not feel that their interests have been trifled with by other citizens who instituted and controlled the former suit. Certain it is that there was no final judgment in that case in favor of those who instituted and prosecuted it, and without such final judgment in their favor there could be no conclusive settlement in their favor of the issue of fact raised by the answer, interposed after the case had gone back to the District Court, whether Hillsboro had received the necessary two-thirds vote. What we said in that case on the question of the number of signatures to the petition was not said with any view of settling the law whether the sufficiency of the petition could be inquired into in proceedings to test the validity of the election. No such question was before us for discussion. It was assumed, by every one in the case, for the purpose of settling on the appeal whether the act of 1890 was constitutional, that the change in the county seat could not be sustained under section 565, Comp. Laws. We cannot say, from the record before us, that the board of county commissioners ordered the election solely under the law of 1890, or under it at all. This fact is not set forth in the alternative writ, and there is no evidence in the case justifying such an inference. The petition presented did not ask that the election be ordered under that statute, or refer to it at all. The board in no manner alluded to it in ordering the election, nor is there anything in the proceedings of such board, so far as they are in evidence in this case, tending to show that the board was proceeding exclusively under the act of 1890, or, indeed, under it at all. When the board canvassed the vote and issued the certificate, it spread upon its records nothing to indicate that it made such canvass and issued such certificate on the theory that all of the election proceedings had been carried on under the statute of 1890. There is no testi-

mony whatever in the case that either the petitioners for the election or the board of county commissioners did not proceed under section 565 of the Compiled Laws. Had it appeared in this case by competent evidence that the board was acting under the act of 1890, there would be no inference, from the fact of ordering an election, that the board had found that the petition was sufficient under section 565; the act of 1890 requiring the petition to be signed by only one-third of the voters of the county, instead of by two-thirds of such voters, as required by section 565. In the absence of evidence to that effect, we have no right to assume that the board proceeded under an unconstitutional statute when there was a valid law under which they could have proceeded.

Finding no error in the case, and being clearly of the opinion that the District Court was right in its decision that the county seat had been lawfully relocated at Hillsboro, the order denying the application for a peremptory writ of *mandamus* is affirmed. All concur.