STATE OF NORTH DAKOTA, EX REL. T. F. McCUE, ATTORNEY GEN-
ERAL, V. ALFRED BLAISDELL, AS SECRETARY OF STATE OF THE
STATE OF NORTH DAKOTA, AND J. W. FABRICK, AS COUNTY
AUDITOR OF WARD COUNTY.

Opinion filed January 16, 1909.

**Counties — Elections — Change in Boundaries — Election — "Electors" —
"Shall be Submitted to the Electors" — "Vote" — "Votes Cast."**

1. Section 168 of the Constitution reads: "All changes in the boun-
daries of organized counties, before taking effect, shall be submitted
to the electors of the county or counties to be affected thereby at a
general election and be adopted by a majority of all the legal votes
cast in each county at such election."

*Held*:

(a) That the word "electors" as used in said section means all
persons possessing the qualifications as to residence, age and citizen-
ship prescribed by section 121 of the constitution as necessary to entitle
them to vote.

(b) "Shall be submitted to the electors" means that all persons
who are qualified to vote in the given county, or counties, shall, in a
legal manner, be given an opportunity to vote on the question of a
change in the boundaries.

(c) That a "vote" is the registration in accordance with law of
the preference or choice of an elector on a given subject.

(d) That "votes cast" are the totals of the separate votes or ex-
pressions of voters' preferences for or against a change in boundaries.

**Elections — "Voter" Distinguished from Elector.**

2. A "voter" as distinguished from an elector, is an elector who
actually votes.

**Elections — "Ballot" Distinguished from Vote.**

3. A "ballot" as distinguished from a vote, is the sheet of paper on
which the voter expresses his choice of candidates, or for or against
a proposition, or both.

**Elections — Number of Votes Necessary — Majority.**

4. A majority of the votes cast upon a question submitted to a
vote, if in the affirmative, carries it, unless the legislative will to the
contrary is clearly expressed in the constitution or the law.

**Counties — Change in Boundaries — Election — "Separate Election."**

5. In a strict legal sense, although the vote on a change in county
boundaries is cast at a general election, it is the holding of a "separate
election," but held in connection with the general election for con-
venience, to save expense, and because of the numerous subjects then
voted upon, a more complete expression of the preferences of the
electors is obtained.

**Constitutional Law — Construction — Legislative.**

6. Legislative construction, when followed by years of harmonious subsequent legislation, is entitled to great weight in determining the construction of constitutional provisions.

**Counties — Change of Boundaries — Election — Majority — What Constitutes.**

7. The elector who does not participate in an election acquiesces in the result of the votes cast by those who do participate, and to hold that the language of section 168 of the constitution requires more than half as many affirmative votes to be cast in favor of a change in boundaries as are cast on any other subject at the same election would be to give as much effect to the act of an elector who did not vote on such change as to that of one who voted in the negative, and render the statutory provision for negative votes useless.

**Counties — Change of Boundaries — Election — "Votes Cast."**

8. The meaning of words in a statute must often be determined by the subject-matter in relation to which they are used; and, as section 168 relates only to the change of county boundaries, the words "votes cast" should be limited to that subject.

**Statutes — Construction of Statutes Adopted from Another State.**

9. A legislative body, in adopting a foreign statute which has been construed by the courts of the state from which it comes, is presumed to have adopted the construction there given it.

**Counties — Change in Boundaries — Election — Majority — What Constitutes.**

10. The question of a change in the boundaries of Ward county, and the erection of the new county of Mountraille from a portion of Ward county, was duly submitted to the electors of that county at the general election of 1908. Four thousand two hundred and seven votes were cast in favor of the proposition, and four thousand twenty-four in opposition, while in that county at such election there were cast nine thousand two hundred fifty-nine votes for the different candidates for governor. *Held,* that the change voted upon was thereby effected.

Application by the state, on relation of T. F. McCue, Attorney General, for a writ of certiorari to be directed to Alfred Blaisdell, as Secretary of State, and J. W. Fabrick, as County Auditor of Ward county. Application denied, and temporary writ quashed.

*T. F. McCue, Atty. Gen.,* and *John E. Greene,* for relator.  *Geo. A. Bangs,* for respondents.

SPALDING, J.  Section 168 of the Constitution of this state, as far as pertinent to the present controversy, reads as follows: "All changes in the boundaries of organized counties, before taking effect, shall be submitted to the electors of the county or counties to be affected thereby at a general election and be adopted by a majority of all the legal votes cast in each county at such election." At the general election in 1908 several propositions for the division of, and the creation of, new counties from the present county of Ward were duly submitted to the electors of that county. None of the propositions received a majority of the votes cast thereon, except the one relating to the creation of the county of Mountraille. This question received 4,207 affirmative votes, and 4,024 negative votes.

It is shown that the various candidates for governor of the state received at that election in Ward county the aggregate number of 9,259 votes. It is apparent from these figures that the proposition to create the new county of Mountraille, while receiving a majority of the votes cast on that proposition, did not receive more than half as many favorable votes as the total vote for governor. On application of the Attorney General the alternative writ of this court was issued, directed to the Secretary of State and the county auditor of Ward county, requiring them to certify. and return a transcript of the records, certificates, and returns in their custody, etc., to this court, and these officers were by the writ commanded to desist from proceeding in the premises until the further order of this court. Return was duly made by the respondent Blaisdell, as Secretary of State, showing the number of votes cast on the question, and the total number of votes cast for governor, as above set forth, and both parties appeared by counsel and submitted their arguments.

The sole question for determination is the proper construction of section 168, supra, as applied to the facts disclosed by these returns. The relator contends that the section referred to, properly construed, requires an affirmative vote equal in number to a majority of the total votes cast for the different candidates for governor, or more than half the highest number of votes cast in Ward county for candidates for any one office, or on any one question,

voted upon at such general election. On the other hand, the respondent contends that when properly construed, the constitutional provision mentioned requires only a majority of the votes cast, upon the creation of the county named, to be favorable to create the new county. At the outset the relator concedes the correctness of this principle and rests his whole contention upon it, namely, that where there is submitted to a vote of the electors of a given county, or other district, a special question, whether so submitted at a general or special election, a majority of the votes cast upon that question only will be sufficient to carry the question or adopt the proposition, unless the legislative will to the contrary is clearly expressed in the law or the Constitution, as the case may be. We may concede that this is a correct statement of the legal principle involved, both on theory and authority. In the present instance he contends that the language of section 168 clearly expresses the meaning of the framers of the Constitution as being that the special question so submitted is lost, unless it receives more than half as many votes as are cast for any office or on any question to be filled or submitted at the same election. Seldom is a question presented on which there is a greater apparent conflict of authority than on the construction of this and similar language contained in statutes and Constitutions of the different states. Matters of importance are pending and held in abeyance in Ward county until this proceeding is decided. The same question is awaiting our decision in other counties, and the exigency requires speedy action on the part of this court. We have given it careful consideration, and have no doubt of the correctness of the conclusions at which we have arrived, both on principle and authority, but to present the reasons for our conclusions logically, with a careful analysis of the different, and oftentimes conflicting, authorities, would require more time than we feel justified in taking, in view of the reasonable demand for speedy action. We shall therefore content ourselves with stating more briefly our reasons, and referring less fully to authorities than we should otherwise like to do.

We deem it advisable to first consider and determine the meaning of certain words contained in the constitutional provision quoted Stripped of meaningless words, as applied to the present controversy, and to simplify matters, we may read that portion of section 168 quoted as follows: "All changes in the boundaries of organized counties shall be submitted to the electors at a general election and

be adopted by a majority of the votes cast at such election." The word "electors" may be used to apply to different classes or bodies of people. It is sometimes applied to all persons who are qualified to vote within their respective political subdivisions. At other times it is used as synonymous with "voters," and in many instances has been used indiscriminately and interchangeably with the word "voters." But its meaning in the section in question is not left in doubt, because it is defined by the Constitution itself. Section 121, as amended, reads: "Every male person of the age of twenty-one years or upwards, belonging to either of the following classes, who shall have resided in the state one year and in the county six months and in the precinct ninety days next preceding any election, shall be a qualified elector at such election. 1st. Citizens of the United States. 2nd. Civilized persons of Indian descent who shall have severed their tribal relations two years next preceding such election." The word "qualified" neither adds to nor detracts from the meaning of the word as there used, or, stating it in another form, the word "electors," in section 168 has precisely the same meaning as though it was preceded by the adjective "qualified." We therefore, conclude that the word "electors" as used in section 168 means all persons who, by the terms of the Constitution, have the qualifications necessary to entitle them to vote. Persons qualified to vote, but who do not vote, are still electors. Proceeding, the phrase "shall be submitted to the electors" must mean that the question of the creation of the new county of Mountraille must be submitted to the electors of the present county of Ward; that is, that all persons who are qualified to vote in said county shall be given an opportunity to vote on the creation of Mountraille county. Whether they exercise their rights of suffrage on this question, or neglect to do so, in no way affects the fact of its submission. If the proper authorities, in a proper manner (which is not controverted in this proceeding), gave them an opportunity to vote on it at the general election last held, it was then submitted to them. These propositions are so plain that they hardly seem to require a citation of authorities. Yet we find the same principle enunciated in Sanford v. Prentice, 28 Wis. 358; Beardstown v. Virginia, 76 Ill. 34. See also United States v. Badinelli (C. C.) 37 Fed. 143; O'Flaherty v. City of Bridgeport, 64 Conn. 159, 26 Atl. 466.

We next come to the interpretation of the words "votes cast," and to aid us in this we may seek a definition of the word "voter."

This word, like the word "elector," is used in various senses, but when used in apposition to, or in contrast with, the word "elector," it has but one meaning. A voter in this sense is an elector who exercises the privilege, conferred upon him by the Constitution and the laws, of voting. He is an elector who does vote, and in the present instance a voter is one who voted at the last November general election, and on the question in controversy is one who actually voted, either for or against the creation of the new county. Am. &. Eng. Enc. of Law, at page 1075, says: "The word 'voters' has two meanings—persons who perform the act of voting, and persons who have the qualifications entitling them to vote." And in Sanford v. Prentice, supra, the term "legal voter" is defined, and we think properly so, as meaning, unless a different meaning appears from other language in the act, a qualified voter who does in fact vote, as the elector in the exercise of his franchise or privilege of voting. An elector is not a voter unless he votes, yet he still retains his qualifications as an elector.

The word "vote," used as a noun, is the expression of the choice or preference of the voter. The choice may be exercised in several different manners; viva voce, by the use of a ballot; by show of hands; by a division of the house or meeting and possibly by other methods. Before the public recognized the wisdom of a secret ballot electors in many places exercised their right to cast their votes by the viva voce method or by a show of hands. When those methods were in vogue, and of necessity as a general rule, each question was submitted separately, and when not so submitted, any person desiring to vote had a right to demand a division of the question. In other communities a ballot was used, and a separate ballot cast for each officer or on each question. Sometimes separate ballot boxes were used—one for each office to be filled, or for each group of offices, like state, county, township, etc. In states or communities where either of these methods was employed, the elector desiring to exercise his right to vote was frequently compelled to remain during the entire day of election at the polling place, and in readiness to vote on any proposition which might lawfully be submitted during the day. To obviate this inconvenience; to facilitate the proceedings; to enable the elector to cast a secret ballot, and to guard against mistakes and fraud; and with the advance of intelligence on questions relating to the privileges and duties of electors—some system of balloting has been almost universally

provided. In many states, including North Dakota, the Australian ballot has been adopted. This enables the elector to vote for all candidates for offices for whom he cares to express a preference in secret, and in the space of a few minutes. The purpose of calling attention to these facts is to more clearly see and define what is meant by the words "votes cast." Under the old system it seems quite clear that it could not reasonably be contended that, when a question was submitted to the electors gathered in a body at a voting place where either a plurality or a majority was required to elect, that if the words "votes cast" were used in the law or Constitution, it should apply to anything except votes cast when the electors voted for the filling of the particular office being voted upon, or for or against the specific question then in issue. In such instances it would be absurd and ridiculous, and a false and un-American standard, to require a candidate for an office to have a majority—not of the votes cast for the office for which he was a candidate, but a majority of the total number cast to fill some other office, or on some other question at the same meeting. The result of the submission of each proposition was announced when completed, and no one ever thought of delaying the announcement of the vote for one officer, or one question, until it was known whether on some other question a greater number of votes was cast. A ballot, as distinguished from a vote in the legal sense, and in a general way, is the piece of paper upon which the voter expresses his choice. Under the Australian system, for the reasons above enumerated and many others, the voter is permitted to express his choice or vote upon many offices, and perhaps many questions on the same ballot. It is but an application of the same principle that prevailed when the choice of the voters was expressed viva voce or by any of the old methods. In other words, notwithstanding he may use but one ballot, the voter casts as many separate votes or expresses his choice as many times, as there are candidates or questions for or against which he votes. To illustrate: He casts a vote for presidential electors, another vote for governor, another vote for member of Congress, and so on through the list of offices to be filled or questions to be voted upon.

In the case at bar the statutes of this state require the submission of amendments to the Constitution, creation of new counties, and other similar questions to the voters on a ballot separate and distinct from the ballot used in voting for the various officers, and

that it be deposited in a separate box. And it is clear to us that
the words "votes cast" as used in section 168 mean the total·
of the separate votes of the voters for and against the question sub-
mitted. The votes cast for presidential electors have no rela-
tion, in the matter of determining who are elected or which party
prevails, to the votes cast for governor and vice versa. There is
no more reason why the votes cast on the question of creating a
new county should have any relation to the votes cast for gov-
ernor than the votes cast for presidential electors should have. Nor
is there any logical reason why the votes cast for governor should
have any relation to those cast on the question of the creation
of a new county. We held in the case of State ex rel. McCue v.
Blaisdell (N. D.) 118 N. W. 141, that the provision in the primary
election law, providing that the electors might express their final
choice for United States senator at the general election was but a
continuation of the June primary election, or was a second pri-
mary on that subject; that, as a matter of convenience and to save
expense, it was held at the same time and place, and conducted by
the same officers as the general election. That principle is analo-
gous to the principle involved in this controversy. The question of
the creation of a new county is submitted to the electors upon a
ballot separate and apart from the one used for the election of
officials. In a strict legal sense it is a separate election. (Howland
v. Board, 109 Cal. 152, 41 Pac. 864), but held in connection with
the general election, and as a part of it, to save the trouble, expense,
and time which would be wasted in holding a special election,
and for the further reason that there is a more general attend-
ance of voters at general elections than at most special elections,
and therefore likely to be a much more complete expression of·
the preferences of the electors. It is true that when our Con-
stitution was adopted, the Australian ballot system had not been
provided for in this state, but it was almost immediately author-
·ized after the adoption of the Constitution, and the provision for
a separate ballot on the different questions submitted has much
weight as indicative of the legislative construction of the pro-
vision in question. The same may be said of many other pro-
visions of our Code regarding elections. While the legislative con-
struction is not necessarily binding on the courts, yet when it has
been followed by a harmonious and constant course of subsequent
legislation which has been in effect and acted upon for a period of

years, as in the present instance, it is entitled to great weight in determining the real intent and purpose of constitutional provisions and requirements. 1 Kent's Commentaries, 465; Cooley's Const. Lim. 81; Ames v. Kansas, 111 U. S. 449, 4 Sup. Ct. 437, 28 L. Ed. 482; B. C. Water Co. v. Baker, 196 U. S. 119, 25 Sup Ct. 211, 49 L. Ed. 409; Com. v. Lockwood, 109 Mass. 323, 12 Am. Rep. 699; People v. Supervisors, 100 Ill. 495; In re Washington St. Ry., 115 N. Y., 442, 22 N. E. 356; Atty. Gen. v. Preston, 56 Mich. 177, 22 N. W. 261; Scanlan v. Childs, 33 Wis. 663 Lick v. Faulkner, 25 Cal. 405.

According to the American doctrine the majority is entitled to rule—the preference of a majority on any question is expressed by the vote of those who actually vote, unless a different intention is clearly expressed. The choice of the voter is expressed by the vote he actually casts for or against a proposition. To adopt the relator's theory in this proceeding would be to give as great weight to a vote which was not cast as to one which was cast, and in effect would be to count the electors who voted for governor, and did not vote on the county division question, as voting against the division. · It ought to require the plainest language, and that it be so expressed as to leave absolutely no doubt in the mind of the intelligent reader of its meaning to justify a court in holding that no vote counts precisely the same as though the vote had been cast against the proposition. The correct principle applicable in cases where the meaning is ambiguous, or is not so expressed as to clearly indicate that an elector who does not vote shall be held as voting "No," is that electors who do not participate in an election, or are not interested enough in public affairs to attend the polls and cast their vote and express a choice, acquiesce in the result of the votes cast by those who do vote, whatever such result may be. It is equally plain that if an elector enters the booth and votes for some candidates and not for others, or votes for all candidates, but fails to express his choice on a question submitted the delegates to those who do vote his rights as an elector and acquiesces in the result, be it one way or the other. See Marion v. Winkley, 29 Kan. 36; Walker v. Oswald, 68 Md. 146, 11 Atl. 711; Tinkel v. Griffin, 26 Mont. 426, 68 Pac. 859; Miller v. School Dist., 5 Wyo. 217, 39 Pac. 879; People v. Chute, 50 N. Y. 451, 10 Am. Rep. 508; Montgomery Co. Fiscal Court v. Trimble, 104 Ky. 629, 47 S. W. 773, 42 L. R. A. 738; Cass County v. Johnston, 95 U. S.

360, 24 L. Ed. 416. Also 9 Notes on United States Reports, page 269, and cases there cited.

In the case at bar it happened that the candidates for governor received more votes than the candidates for any other office in Ward county, but the court has no knowledge and no method is provided by law for advising the court officially how many ballots were actually cast in Ward county at the last election. It is a fact of universal knowledge that in an election in which any considerable number of electors participate, some voters fail to vote for any candidate for one office, and others for any candidate for some other office, and that the candidates for no office ever receive at a general election votes equalling the total number of ballots used or electors participating on some question. From this it is self-evident that if the principle contended for by the relator is correct that the standard to be employed or the means to be used in determining whether the division proposition carried should be the number of ballots used, because they indicate the number of electors who actually participated in the election, and they furnish the only means for acquiring this knowledge. Yet the law makes no provision whereby any state official can determine how many electors actually participated in the Ward county election. It is obvious that had the Legislature adopted the construction placed upon section 168 of the Constitution by the relator, it would long since have provided these means.

It is contended that the words "at such election" enlarge the application of the words "votes cast," and clearly indicate that the highest vote cast on any question at the general election is the criterion by which a majority must be arrived at. But, from the suggestions and reasons we have stated above, and particularly from a consideration of the meaning of the words "votes cast," it is clear to us that this contention is erroneous. It certainly leaves the meaning ambiguous, and in that event it is conceded that a majority of the votes cast on the question at issue controls. It is argued that to give it this effect we must add to the sentence the words "on such question," or their equivalent; that without such addition the meaning is as contended for by the relator. We, however, think that to give the provision the interpretation which the relator favors, it would be necessary to read into the sentence "on any question or for any candidate." It is a well-established rule of statutory construction, and in accord with common sense, that

the meaning of words must often be determined by the subject-matter in relation to which they are used. Section 168 relates only to the creation of new counties or the change in boundaries of counties; and, in accord with the above rule of construction, the words "votes cast" should be limited to the subject dealt with in that section.

It is also urged that the fact that in different sections of the Constitution, relating to different subjects which are to be submitted to a vote, the language is not uniform, and in some of them it is specified explicitly that the vote referred to is the vote cast upon the question in hand; that therefore section 168, not being so specific, must have been intended to operate in accord with relator's contention. It is well known that in the constitutional convention various committees were appointed, each having jurisdiction over a subject differing from those being considered by the other committees. They did not act in concert on questions of this character. One might copy a provision from the Constitution of one state, and another from some other state. This undoubtedly accounts for the varying phraseology of the different provisions for submitting questions to a vote, and necessitates considering each one independently of the others. We, however, may mention one other provision; namely, that relating to amendments to the Constitution. Section 202 requires proposed amendments to be submitted to the people, and if they approve and ratify "by a majority of the electors * * * voting thereon," the amendment becomes a part of the Constitution. This section permits the amendment of the Constitution by only a majority of the electors voting on the proposed amendment. The amendment of the Constitution is the most important political function which the people can perform. The change of county boundaries and the erection of new counties is of minor importance as compared with a change in the organic law. It seems very unlikely that the framers of the Constitution should have contemplated that a mere change in county boundaries, or the question of forming a new county, should require the assent of a larger proportion of the electors than is necessary to change the fundamental law. Aside from the considerations which we have set forth, leading to the conclusion at which we have arrived, nearly every authority which we have been able to find after a careful search, construing provisions like those of section 168, or in effect the same, sustains our view.

' Courts in construing constitutional or statutory provisions which have been taken from another state almost invariably hold that the Legislature or the Constitution makers are presumed to have adopted it with knowledge of the construction or interpretation given it by the courts of the state whence it comes, and therefore to have adopted such construction or interpretation. 2 Lewis Suth. Stat. Const. 404; White v. Chicago, etc., Ry Co., 5 Dak. 508. 41 N. W. 730 ;Sanford v. Duluth & D. Elevator Co., 2 N. D. 6, 48 N. W. 434; Jasper v. Hazen, 4 N. D. 1, 58 N. W. 454, 23 L. R. A. 58; Cass County v. Imp. Co., 7 N. D. 528, 75 N. W. 775; Oswald v. Moran, 8 N. D. 114, 77 N. W. 281; Bank v. Gutterson, 15 S. D. 486, 90 N. W. 144. As far as we have been able to ascertain, but one Constitution contains a provision clearly identical with section 168. The presumption to which we have referred applies with great force in this instance for the reason that the wording is so peculiar that the Constitution adopted by two states, more than 40 years intervening between them, would not be likely to contain the same language unless one was copied from the other. The 1848 Constitution of the state of Wisconsin contains the following provision: "Article 3, § 1. Every male person, etc., belonging to either of the following classes, etc., shall be deemed a qualified elector: * * * Provided that the Legislature may, at any time, extend by law the right of suffrage to persons not here enumerated; but no law shall be in force until the same shall have been submitted to the vote of the people at a general election and approved by a majority of all the votes cast at such election." We may note that the only difference in the phraseology of the two sections is that in Wisconsin it is submitted to the vote of the people, while in this state the question is submitted to the electors, and we have substituted the word "adopted" for the word "approved," and have preceded the word "votes" with "legal," a meaningless adjective in that connection, and the other variations make no change in the meaning. This provision of the Wisconsin Constitution was before the Supreme Court of that state in 1866 in Gillespie v. Palmer, 20 Wis. 544, and it was held that the language of the section only required a majority of the votes cast upon the question which was in the mind of the Constitution makers in framing that section. This case was followed and approved in Sanford v. Prentice, 28 Wis. 358. In the light of the circumstances we must presume that section 168 was adopted advisedly, and with it the construction placed upon

the same language by the appellate court. of Wisconsin. It is but fair to add that in some subsequent opinions by the Wisconsin court the decision of Gillespie v. Palmer, supra, was severely criticised, but it was never overruled, and is cited as authority as late as 71 Wis. 252, 3 N. W. 242, in Brown v. Phillips, and it has been referred to and cited as authority by the courts of many other states.

The conflict in authorities, to which we referred in the beginning, is more apparent than real. In many states the courts have held the peculiar provisions they were considering as requiring the assent of a majority or other percentage of the electors; the word "electors" being employed in some instances, and in others the words "voters" or "qualified voters," in such connection as to indicate that electors were meant. Several of these cases distinguish clearly between the language of section 168 and that construed. Among the authorities which have passed upon the proper interpretation of "votes cast," and provisions in effect like those of section 168, and where such language has been held to only require a majority of the votes cast upon the question at issue, are Gillespie v. Palmer, supra; Sanford v. Prentice, supra; Board v. Winkley, 29 Kan. 36; State v. Echols, 41 Kan. 1, 20 Pac. 523; State v. Grace, 20 Or. 154, 25 Pac. 382.; Territory ex rel. McGuire v. Board of Trustees, 13 Okl. 605, 76 Pac. 165.; Chamlee v. Davis, 115 Ga. 266, 41 S. E. 691; Dunnovan v. Green, 57 Ill. 63. Others construing somewhat similar provisions, many of them going much farther than is necessary in the case at bar to sustain a vote of a majority only of those voting upon the question, or distinguishing the language they were considering from that employed in section 168, are as follows: South Bend v. Lewis, 138 Ind. 516, 37 N. E. 986; Dayton v. St. Paul, 22 Minn. 400; Howland v. Board, 109 Cal. 152, 41 Pac. 864; Fritz v. City, 132 Cal. 373, 64 Pac. 566; Taylor v. McFadden, 84 Iowa, 262, 50 N. W. 1070; Day v. City of Austin (Tex. Civ. App.) 22 S. W. 757; Green v. Board, 5 Idaho, 130, 47 Pac. 259, 95 Am. St. Rep, 169; Yesler v. Seattle, 1 Wash. 308, 25 Pac. 1014; Strain v. Young, 25 Wash. 578, 66 Pac. 64; Fox v. Seattle, 43 Wash. 74, 86 Pac. 379; Walker v. Oswald, 68 Md. 146, 11 Atl. 711; Tinkel v. Griffin, 26 Mont. 426, 68 Pac. 859; Miller v. School Dist., 5 Wyo. 217, 39 Pac. 876; State v. Rhue, 24 Nev. 251, 52 Pac. 274. Several courts have held that the question to be determined was the method or means by which the number of electors of the district was to be ascertained officially; and in some such cases, where the

ascertainment of the number of electors was required, it has been held that a court taking judicial notice of the votes cast at a general election would adopt the highest vote at such election as showing the number of electors in the given district. This is the holding of South Dakota in a recent case, which we shall not allude to at length, especially in view of a previous decision of this court. We have cited the foregoing authorities in support of the conclusion which we have arrived at without reference to previous decisions of this court, which are all in accord with its conclusions as now constituted. It is only necessary to refer to State v. Langlie, 5 N. D. 594, 67 N. W. 958, 32 L. R. A. 723, which is directly in point. The question in that case was one of removing the county seat of Traill county. The law construed provided for ordering an election on the relocation of county seats, and for notices thereof for the next general election, and required that some one place should have two-thirds of the votes polled. The city of Hillsboro received two-thirds of the votes polled on the question of relocating the county seat, but not two-thirds of the votes polled for one office at the same election, and it was held that it was only necessary to receive two-thirds of the votes polled on the question of relocation, to change the county seat. The only distinction between the language in that case and in the present is that the word "polled" was used in the place of "votes cast." It is beyond question that the meaning is identical. In that case the court said: "When a majority of the electors is spoken of, the highest number of votes cast at the election must furnish the standard for determining whether the particular measure which must have such a majority has been carried"—and held that the vote polled was the vote polled upon that question alone, as it was the only matter the statute was dealing with.

The application is denied, and the temporary writ quashed. All concur.