THOMAS W. MARTIN v. C. P. FULLAM ET AL.

Special Term at Brattleboro, February, 1916.

Present:  MUNSON, C. J., WATSON, HASELTON, POWERS, AND TAYLOR, JJ.

Opinion filed April 8, 1916.

*Elections—"General Election"—"Ballot"—"Vote"— Conduct of Elections—Check List—Construction of Statutes— Purpose of Act—Referendum—Nos. 4 and 172, Acts 1915— Qualification of Voters—Necessity of Payment of Assessed Taxes.*

"General election" throughout the Public Statutes is uniformly used to designate what before had commonly been called "freeman's meeting."

As used in §33 of the Primary Act, No. 4, Acts 1915, and in §59 of the Prohibitory Act, No. 171, Acts 1915, the word "ballots" designates the instruments by which the voters are to express their choice, and the word "votes" has reference to their expression of choice by the use of such instruments.

In §33, No. 4, Acts 1915, and in §59, No. 171, Acts 1915, the clause, "all regulations provided by law for conducting general elections shall be applicable to the votes provided for in this act," has reference

to such regulations for conducting a general election as are appropriate to the conduct of voting in each particular town.

Under the Primary Act and the Prohibitory Act, Nos. 4 and 171, Acts 1915, which make the regulations for conducting·general elections applicable to the respective referenda, but not mentioning check lists, P. S. 85, relating to check lists for annual town meetings, governs.

If no check list has been provided as required by P. S. 85, requiring the selectmen in every town of more than 4,000 inhabitants, and in other towns on petition in writing of 20 or more voters, to prepare and post a check list at least 30 days before the annual town meeting, the right to vote on the questions submitted by the Primary Act, No. 4, Acts 1915, and by the Prohibitory Act, No. 171, Acts 1915, does not depend on the presence or absence of a check list.

A statute is to be construed with reference to its manifest object, and if the language is susceptible of two constructions, one of which will effectuate and the other defeat that object, it should receive the former construction.

Under the referendum provisions of Nos. 4 and 171, Acts 1915, the Primary Act and the Prohibition Act, the questions were not submitted to the town meetings as such, wherein only those who paid their taxes before a specified date had a right to vote, but in effect to a special meeting of the freemen of the State, in which all may vote who are entitled to do so at general elections, regardless of whether they have paid their taxes.

A freeman, although he has not paid his taxes, is entitled to have inserted on a check list for the annual town meeting his name as being eligible to vote thereat on the questions submitted by the Primary Act and Prohibition Act, Nos. 4 and 171, Acts 1915.

PETITION for a writ of mandamus, brought to the Supreme Court for the County of Orange at a special term thereof held on February 28, 1916, and then heard on the pleadings, and an agreed statement of facts.

The petitioner is a male citizen of the United States, forty-nine years of age, has been a resident of the town ·of Brookfield in this State for the past twelve years and is now such resident. He took the freeman's oath required by section 74 of the Public Statutes more than eighteen years ago since which time he has resided in the State of Vermont continuously and has not

forfeited his rights and privileges as a freeman of the State in any manner.

The Legislature of 1915 passed an act approved April 1, 1915, entitled ''An Act to provide for primary elections,'' sections 31, 32, 33, 34 and 35 of which read:

Sec. 31.  This act shall take effect on the twentieth day of March A. D. 1916, provided that a majority of the ballots to be cast as hereinafter provided shall be YES, and provided that, if a majority of the ballots to be cast as hereinafter provided shall be NO, then this act shall take effect on the twentieth day of March, A. D. 1927, but as to sections 31, 32, 33, 34 and 35 this act shall take effect from its passage.

Sec. 32.  In each town and city the warning for the annual meeting in 1916 shall contain an article in substance as follows: ''Shall an act of the general assembly of 1915, entitled 'An Act to provide for primary elections,' become a law March 20, 1916?''

The secretary of state shall at least ten days prior to said annual meeting in 1916, furnish the town clerk of each town and city with a sufficient number of ballots to be used in voting upon the question of the acceptance of the provisions of this act.  Said secretary shall also, when furnishing such ballots, furnish each town clerk with a sufficient number of sample ballots printed on different colored paper, which shall be posted in three or more public places in such town, at least six days prior to said annual meeting.

Sec. 33.  The ballot clerks, board of civil authority and town and city clerks shall perform the same duties in respect to the ballots to be used under this act as are imposed upon said officials by chapters 11 and 12 of the Public Statutes, except as otherwise provided in this act, and all regulations provided by law for conducting general elections shall be applicable to the votes provided for in this act.

Sec. 34.  A special box shall be provided for the reception of the ballots provided for in this act, which shall be opened at the hour the meeting is called, and shall remain open until the close of the meeting not earlier than 3 o'clock in the afternoon.

Sec. 35.  The town clerks of the several towns shall within twenty-four hours from the adjournment of said annual meeting in 1916, report to the secretary of state upon blanks furnished by said secretary of state the result of the vote upon the question of the acceptance of the provisions of this act.  On the

fifteenth day of March, A. D. 1916, said secretary of state shall canvass the returns so made to him, and shall, within two days thereafter, issue his proclamation certifying the result of such vote, and declaring the time when the provisions of this act shall take effect.

The same legislature also passed an act approved March 12, 1915, entitled "An Act to prohibit the sale of intoxicating liquors," section 57, as amended by No. 172, Acts of 1915, reads:

Sec. 57.    This act shall take effect on the first day of May, A. D. 1916, provided that a majority of the ballots to be cast as hereinafter provided shall be YES, and provided that, if a majority of the ballots to be cast as hereinafter provided shall be NO, then this act shall take effect on the first day of May, A. D. 1927, but as to sections 58, 59, 60, 61 and 62 this act shall take effect from its passage.

The first clause of section 58 reads:

Sec. 58.    In each town and city the warning for the annual meeting in 1916 shall contain an article in substance as follows: "Shall an act of the general assembly of 1915 entitled, 'An Act to prohibit the sale of intoxicating liquors,' become a law May 1, 1916?"

The second clause of section 58 and sections 59, 60 and 61 are essentially like the second clause of section 32 and sections 33, 34 and 35 above quoted from the so-called Primary Act.

The agreed statement of facts filed in the case is to the effect that all averments in the relator's petition are true except such as are denied by the defendants' answer.    It is alleged in the petition in effect that as provided by law the selectmen of the town of Brookfield duly made an alphabetical list of the persons qualified to vote on the 7th day of March, 1916, at Brookfield, on the questions to which the referendum is applied by the sections of the two acts of 1915, before quoted, and that a copy of the check list so made was lodged in the town clerk's office in the town according to law; that the petitioner ascertained that the copy of such check list so lodged did not contain his name as being eligible to vote on the questions submitted by said acts of the Legislature; that thereupon on the 26th day of February, 1916, he appeared before the defendants, they constituting a majority of the board of civil authority of the town, which said board had and has the sole authority, and was legally sitting at that time and place, to revise the aforesaid check list

by inserting in the said copy left in the town clerk's office the names of the voters entitled to vote on the referenda, March 7, 1916, at Brookfield; that the petitioner when so before the board of civil authority demanded that his name be inserted by said board on said copy of the check list, for the purpose of enabling him to vote on those questions; that the petitioner stated under oath before said board that he was a male citizen of the United States, over twenty-one years of age, had taken the freeman's oath required by law, had resided in the State of Vermont for the past forty-one years and in the town of Brookfield for the past twelve years, had not resided without the state since taking the aforesaid oath, and had not forfeited his rights as a freeman of the state; but that he had not paid the taxes levied and assessed against him by the town of Brookfield, and due prior to February 15, 1916.

The petition further alleges that immediately following the petitioner's aforesaid demand and statement, the defendants informed him that they would not insert his name in said copy of the check list for the purpose of enabling him to vote on the referenda mentioned, because he was not entitled to have his name so inserted for that purpose, by reason of the fact that he did not pay his taxes due to the town of Brookfield, on or before February 15, 1916.

The petitioner further alleges in his petition that he can not vote on the 7th day of March, 1916, at Brookfield, at a meeting of the legal voters held for the purpose of voting on the aforesaid questions, unless the copy of the check list is corrected by the insertion of his name thereon by the defendants acting as a majority of the board of civil authority.

The prayer of the petition is, that a writ of mandamus may issue to the defendants as members of the board of civil authority of Brookfield, commanding that they immediately and without delay place his name upon the aforesaid copy of the check list so as to entitle him to vote on the referenda before mentioned.

The defendants in their answer admit that they are members of the board of civil authority of the town, and at the meeting of said board on the 26th day of February, 1916, they constituted the board, and that said meeting was held for the purpose of revising a copy of the check list filed in the town clerk's office of the town by the selectmen; but they deny that the check list mentioned in the relator's petition was solely for

determining who should vote on March 7, 1916, on the referenda .
mentioned, and state that the check list which they were sitting
to revise was the check list required by section 85 of the Public
Statutes.

The agreed statement of facts states, however, that the
check list mentioned in the answer as under section 85 of the
Public Statutes, will be a legal check list under section 75 of
Public Statutes if the name of the relator is added thereto as
prayed in the petition.

*Hale K. Darling* for the relator.

*John N. Harvey* for the defendants.

WATSON, J.   Each, the Primary Act and the Prohibitory
Act, involves a question of general public policy, the former
as a regulation of elections, and the latter as a regulation, under
the police power, for the public good.   From a legal standpoint,
the people of the whole state are equally interested therein.
Each enactment has become a law to take effect at a future
time, irrespective of what the result of the vote on the referen-
dum may be, but the time of taking effect is contingent upon
the result of such vote.   The purpose of each Act is of such im-
portance that the Legislature, in its wisdom, deemed it advisable
in this manner to ascertain the real public opinion concerning
it, and upon that opinion, as it may be expressed in the way
provided for, was made to depend which of the two dates named,
the Act should take effect.   Such, in short, being the nature and
importance of the enactments, was it the intention of the Legis-
lature to get such expression of opinion by vote of all the free-
men of the State, or was it the intention to get such expression
of opinion from those only who by law are entitled to vote in
town meetings upon matters relating exclusively to the town
or city in which the votes are given?   If it was the latter and
not the former, then it was the intention of the Legislature to
get an expression of opinion concerning these two Acts of
state-wide interest and importance, from a portion only of the
freemen of the State, excluding from the privilege of taking
part therein, the rest of the freemen because, and only because,
they failed to comply with a law affecting, so far as the indi-
vidual freeman is concerned, the interests of the particular town

or city in which he resides. While it may not be a constitutional privilege to vote upon the two questions submitted to the people, it would not be going far astray to say that when such an expression of opinion by popular vote is provided for by the Legislature, it becomes a public privilege of the freemen of the State to exercise the right of voting on the question submitted. If it may properly be classed as such a privilege, then to deny a freeman the same right of voting as is given to other freemen of the State for some reason not recognized by the Constitution, raises the grave question whether his constitutional rights are not infringed. Section 34, Ch. II of the State Constitution, provides that every man of the full age of twenty-one years, and having the other qualifications specified therein, and who will take the oath or affirmation there following, "shall be entitled to all the privileges of a freeman of this state." While no constitutional question was presented in argument, and we do not decide the one suggested, still the privileges there guaranteed are not to be lost sight of, in determining the question before us.

Each of the Acts of 1915 provides that the ballot clerks, board of civil authority, and the town and city clerks, shall perform the same duties in respect of the ballots to be used thereunder as are imposed upon those officials by chapters 11 and 12 of the Public Statutes, except as otherwise provided in the Act, "and all regulations provided by law for conducting general elections shall be applicable to the votes provided for in this act." The two chapters named have reference (giving the titles of the chapters) (11) to Ballots, and (12) to Warning and Conducting Elections. In considering the meaning of the provision making applicable to the votes all regulations provided by law for conducting general elections, light is had by an examination of other statutes by which questions of general interest throughout the state have been submitted to a popular vote.

The term "general election" is defined by section 5 of the Public Statutes to mean "any election of state and county officers, representatives to Congress or electors." (By No. 1, Sec. 1, Laws of 1915, it is made to include United States Senators.) And throughout the Public Statutes (revision of 1906) the term "general election" is uniformly used to designate what before had commonly been known as "freemen's meet-

ing.'' This accounts for the change in language in providing
for the referendum in each of the Acts of 1915, from what it
was in previous Acts under which questions were submitted to·
the people. Thus in the act of 1852, prohibiting traffic in in-
toxicating liquor, section 28 provided for the holding of meet-
ings in the several towns, ''at which the freemen of this state
may express their judgment and choice in regard to this act,''
etc. See *State* v. *Parker,* 26 Vt. 357. By the Act of 1902,
to regulate the traffic in intoxicating liquor, section 101, the·
officers of every town or city were required to call a special
meeting, ''providing for an opportunity of the freemen of this·
State to express their judgment and choice in regard to this act,''·
etc.; and under section 103, ''All regulations provided by law
for conducting freemen's meetings shall be applicable to the·
votes provided for on the referendum as provided for in section
101 of this act.'' By the Act of 1912, relating to the proposed
articles of amendment to the Constitution, it was provided (Sec.
2) that the people should be assembled for the purpose of voting
on said articles, in the respective towns and cities at the same
time and place as for the annual town or city meeting, and that
the warning for each meeting should contain an article, ''To see
if the freemen will vote to accept or reject the proposed articles
of amendment to the Constitution of Vermont.'' By the Act
of 1912, No. 13, to provide for the erection of a State building,
the selectmen of each town, when preparing the warning for
the annual March meeting in 1914, were required to incorporate
in such warning an article, in short, to see if said Act should
''become a law July 1, 1914.'' And under section 10, ''All
regulations provided by law for conducting general elections
shall be applicable to the votes provided for on the referendum
as hereinbefore provided.'' There, as in the Acts of 1915, it
was made the duty of the secretary of state to furnish the town
clerk of each town with ballots to be used in such voting, and
he was to canvass the returns made to him by the town clerks,
as to the result of the vote, and issue his proclamation certifying
the result of the vote, and declaring the time when the pro-
visions of the Act should take effect.

In the Acts under consideration, it should be noticed, too,
that in section 33 of the Primary Act, and in section 59 of the
Prohibitory Act, the word ''ballots'' does not mean the same as
the word ''votes.'' The two sections refer to ''ballots to be

used," meaning the same thing as the same phrase in the preceding section in each Act, where provision is made for the furnishing by the secretary of state of "ballots to be used," etc. As used the term "ballots" means the instruments by which the voters are to express their choice; and the word "votes" has reference to their expression of choice by the use of such instruments. See *Tinkel* v. *Griffin,* 26 Mont. 426, 68 Pac. 859; *State* v. *Blaisdell,* (N. D.), 119 N. W. 360. And the last clause in each of the sections mentioned by number, has reference to such regulations for conducting a general election, as are appropriate to the conduct of voting in the particular town. Giving this construction, the matter of check lists not being mentioned, we think the Acts contemplate that the general provisions of P. S. 85, relating to check lists in connection with annual town meetings, should govern. There is nothing indicating that any check list is required, other than the law of that section, and there the requirement depends upon the town being of more than four thousand inhabitants, or upon a petition in writing of twenty or more of the legal voters being presented to the selectmen. In either of those events the selectmen are required, at least thirty days before the annual town meeting, to make a check list of the persons qualified to vote at such meeting, cause copies thereof to be posted, etc. If no check list has been provided as required by that section, the right of a man to vote on the questions under referendum does not depend upon the presence or absence of a check list; but rather upon whether he falls within the class of voters contemplated by the Legislature. If a check list were required in every town in any event, the two enactments, like the Act submitting to the people the question of the proposed constitutional amendments, would most likely have had provisions expressly relating thereto. "A statute is to be construed with reference to its manifest object, and if the language is susceptible of two constructions, one of which will carry out and the other will defeat such manifest object, it should receive the former construction." *In re National Guard,* 71 Vt. 493, 45 Atl. 1051; *Ex Parte Cohen,* 104 Cal. 524, 38 Pac. 364, 26 L. R. A. 423, 43 Am. St. Rep. 127.

If the purpose of the Legislature was to place the matter of such voting before the town meeting as such, it was very easy to say so in apt language, and to get the expression of those who could legally vote in such meetings, without making the

regulations for conducting general elections applicable to the votes provided for. The view here expressed is strongly borne out by the provision in each Act that "a special box shall be provided for the reception of ballots provided for in this Act, which shall be opened at the hour the meeting is called, and shall remain open until the close of the meeting not earlier than three o'clock in the afternoon." It is significant in the same direction that no officer of the town meeting has authority to declare the result of the votes so given, it being made the duty of the respective town clerks to report to the secretary of state the result of the votes, and of the latter to canvass the returns and issue his proclamation certifying the result, not in any town or towns, but in the whole state. From the above considerations, it is manifest that the questions upon which is sought the public opinion by referendum, were not placed before the town meeting as such; but for convenience, and perhaps for economy, they were placed before the people at that time and place, not as a town meeting wherein only those who paid their taxes before a specified date had a right to vote, but in effect as a special meeting of the freemen, in which all those who are entitled to vote at general elections may vote irrespective of the payment of their taxes. The legislators are the representatives of the people, and nothing short of plain and unmistakable language, showing such to have been the intention of the Legislature, will justify the conclusion that these important state-wide questions, involving public policy, were submitted by that representative body other than to the people it represents, in other words to the electorate. To submit those questions to less than the entire voting element of the people, would be in conflict with the fundamental principle of democracy, "the exercise of power by the mass of the people."

The record shows that the check list which the defendants, as the board of civil authority, were revising on the 26th day of February, was a copy of the check list filed in the town clerk's office of the town by the selectmen, under the provisions of section 85 of the Public Statutes. We understand this to mean that it is a check list required by the provisions of that section. It follows that the relator was entitled to have his name inserted thereon, as he demanded, so that he may vote on the referenda under the two Acts of 1915, at the time of the annual meeting of the town of Brookfield, March 7, 1916.

*Judgment that the prayer of the petition is granted, and
that a mandamus issue directing the defendants, as members
of the board of civil authority of the town of Brookfield, forth-
with to insert the relator's name on the said copy of the check
list as demanded by him, that he may vote on the said two ques-
tions under referendum, at the time of the annual meeting in
that town, to be held March 7, 1916, without costs.*