STATE v. DADE COUNTY.

198 So. 102

En Banc

Opinion Filed October 15, 1940

*George Couper Gibbs,* Attorney General, *Tyrus A. Norwood,* Assistant Attorney General, for Appellant;

*Hudson & Cason,* for Appellee;

*Richard H. Hunt* and *George H. Salley, Amici Curiae.*

THOMAS, J.—This apeal was entered by the State of Florida from a decree of the circuit court validating bonds in the amount of $2,000,000, proposed to be issued by Dade County, for the purchase and improvement of public parks.

We are convinced from our study of the record and briefs that but two questions need an answer by this Court in order to determine the litigation, namely: (1) whether the election was valid; and (2) whether the ballot was in proper form.

After preliminary resolutions had been adopted by the board of county commissioners, as was therein provided the matter of incurring the indebtedness was submitted to the electors at the same time and place as the primary election held on May 28, 1940, for their approval or rejection.

Under Section 9 of Chapter 14715, Laws of Florida, Acts of 1931, it was proper that the bond election be held simultaneously with the primary election, provided "separate ballot boxes and separate ballots" were used and "separate returns (were) made and canvassed."

In accordance with the requirements of Chapter 18405, Laws of Florida, Acts of 1937, voting machines were used in the election, and because of the reference to "ballots" in the law first cited, we refer to the latter Act for a description of the "ballot" in elections where the machines are employed. There it is defined as "that portion of the cardboard or paper or other material within the ballot frames containing * * * a statement of a * * * question or proposition with the word 'yes' for voting for any question or proposition, and the word 'no' for voting against any question."

At the election under question the voting machines were so arranged that the ticket containing the names of the candidates and the "ballot" stating the proposition relative to the bonds could be locked and unlocked separately, so that each was available to the elector qualified to vote in the primary or upon the bonds, respectively; that is to say, if an elector appeared who was not a freeholder, that part of

the device on which he could select the candidate of his choice was available to him, but the part recording the votes on the bonds was locked. By the same arrangement, if one entered the booth who was qualified to vote both for candidates and for or against the bonds, he could register his choice with the levers opposite the names on the ticket and those opposite the proposition relative to the bonds.

The record shows that 21,346 voters favored the issuance of the bonds and 2,729 voted in the negative, or that a total of 24,075 who entered the booth indicated their preference about the issuance of the bonds. More than nine thousand electors qualified to participate in the primary and the bond elections voted in the former but not in the latter. There were on that day 50,725 qualified electors in the county who were freeholders and therefore eligible to vote in the bond election.

This brings us to the first point we must determine and the decision of which involves a construction of the constitutional provision containing prohibitions against the issuance of bonds, unless the same bear the stamp of approval of those who will apparently, because taxpayers, bear the tax burden to discharge the debt. So much of it as is pertinent to the case under consideration, follows: " * * * Counties * * * shall have power to issue bonds only after the same shall have been approved by a majority of the votes cast in an election in which a majority of the freeholders who are qualified electors residing in such counties * * * shall participate * * *."

Thus we state the question more simply: Did a majority of the electors who were freeholders "participate" when they went into the polling booth where there was available to them a machine on which they could show a choice in the selection of candidates, and on the issuance of

the bonds, although fewer than a majority voted for or against the latter? In other words, to make the election effective it was necessary that 25,363 electors participate, and that more than half of this number approve the issuance of the bonds. Twenty-four thousand seventy-five voted either for or against the proposition, and 9,403 electors qualified to vote in the primary as well as the bond election, indicated a choice in the former and ignored the latter.

It is urged by the appellee that the more than 9,000 electors can be said to have participated in the bond election despite the fact that when they entered the election booth they cast their ballots for candidates for public office, but refrained from voting on the issuance of the bonds.

Of course, the determination of their status, so far as the latter election was concerned, must depend on the construction of the verb "participate." It does not seem necessary for us to enter into an analysis of that word, the meaning of which is ordinarily accepted, and the nearest perfect synonym of which is "take part."

We do not find in the decisions of this Court any case precisely in point. Perhaps the one which dealt with facts more nearly approaching those outlined above was State, et al., v. City of Tampa, 137 Fla. 29, 187 So. 604, where by divided opinion the decree of validation was affirmed. Even had the case been decided by a clear majority, it would have been of little value to us in the solution of the present controversy because of an essential difference in the factual situation. In that case certain voters had appeared at the polls, were admitted to the voting machine and failed to use them so that their intentions with reference to the proposition of the issuance of bonds could be ascertained. The main difference between the two controversies is that in the cited case an attempt to vote was made by the electors at an

election where only the proposition was presented and no other ticket was involved. In State *ex rel.* Thomas, *et al.,* v. Williams, *et al.,* 100 Fla. 996, 130 So. 428, this Court referred to an opinion by the Supreme Court of North Dakota, in State v. Blaisdell, 18 N. D. 31, 119 N. W. 360, as authority for the definitions of voter and elector. Although the exact question with which we are dealing was not discussed in the Florida case, it seems to have been considered in the one which was cited, so we now re-refer to the expressions of the Supreme Court of North Dakota, because there is a similarity between the problem that court was solving and the one with which we are dealing. There the Constitution provided that changes in the boundaries of counties should not be effective until submitted to the electors of the county affected and approved by a majority of all the legal votes cast at a general election. The change proposed was approved by a slight majority of the votes cast on that proposition, but the approving votes were not more than half of the total votes cast for the various candidates for public office. The court held that the change was approved because the question of the alteration of county boundaries was one separate and distinct from the selection of officials, hence, in effect, holding that those who participated in the latter took no part in the former. The Supreme Court of California, in Morgan v. City of Los Angeles, 187 ac. 1050, citing State v. Blaisdell, *supra,* decided that where a bond election and a primary election were consolidated, and the ballot contained the names of the nominees as well as the proposition relative to the issuance of bonds, the requirement that the bonds be approved by a two-thirds affirmative vote was met where two-thirds of those actually voting on that proposition alone indicated their choice in the affirmative, although the total approving

votes were fewer than two-thirds of the total number of votes cast for the selection of city officers.

It seems to us that in the instant case there is even more reason to hold the matter of the issuance of the bonds was separate and distinct from the selection of the State and county officials because of the provisions which we have quoted that the elections might be held at the same time, but that there should be separate ballots and a separate canvass and return. To each of the electors privileged to show a preference relative to candidates and bonds, 9,000 in number approximately, who entered the polling booth, there was given the opportunity to exercise that privilege, and by taking part in the one only and by ignoring the other, he pointedly refused to participate in the voting on the issuance of the bonds. For all practical purposes that part of the voting machine on which were listed the names of the Democratic nominees was separate and distinct from that part where there appeared a statement of the proposition for the bonds. Obviously, such elections were allowed to be held simultaneously because of convenience and economy, and the county commissioners were to be commended in exerting their authority thus to curtail expenses and accommodate the voters. Another incentive for holding joint elections is, doubtless, the probability that one would prove a drawing card for the other and that the number of electors attracted to the polls would therefore be increased.

Although, as is urged by appellee, the courts are chary of interference with popular elections, regularly held, in which the people have fairly expressed their will, nevertheless, in view of the necessity of determining whether a majority of those qualified to exercise their franchise actually have participated in the questioned election, in view of the expressed inhibition of the Constitution, we feel that

the true interpretation of the organic law as we understand it should be applied, and in doing this we cannot but conclude that those electors who registered a choice for the nominees of the Democratic party took part in that primary only when they ignored the opportunity, while in the polling booth, to cast a vote for or against the bonds.

The State criticizes the form of the ballot because the qualified electors, who were freeholders, were not given the opportunity to vote separately on the expenditure for each of the parks, the total bond issue of two million dollars having been allocated one-half to a park situated on Key Biscayne and the other half to one situated north of Baker's Haulover. The original resolution of the board of county commissioners gives in detail the items of expenditure to be made at each of these locations to provide a public park, and the notice of election also conveyed this information to the public. If the bonds were eventually issued, any tax-payer would be protected from the application of the proceeds of the bonds to any other purpose than those shown in the records of the county. We do not find much sympathy for the position that those allowed to vote should have been given the opportunity of indicating a choice in the construction of a park at each site. Authority claimed for this position is the case of Antuono v. City of Tampa, ct al., 87 Fla. 82, 99 So. 324, but a study of that decision does not impress one with the similarity of the two cases. Under its charter the City of Tampa had the right to issue bonds for municipal improvements, and one of the propositions submitted was whether bonds should be issued, the proceeds to be expended on the sewerage system, certain streets, the fire department, an incinerator, water mains, bridges, and a sea wall. Obviously, these projects were varied and unrelated and the court announced the rule that

each proposition should be submitted separately and that it was unfair to the taxpayers to group such dissimilar objects under one proposal. Chapter 19761, Laws of Florida, Acts of 1939, authorizes Dade County to acquire and hold land for park purposes. That was a sufficient designation upon the ballot so that the voters could indicate their choice for the program intelligently and without in the least being misled, and the general purpose being the same, it was proper for the board of county commissioners to submit but one proposition. This view seems to be borne out by the decision of the Supreme Court of California in Trinity County Bank, *et al.*, v. Haas, 91 Pac. 385, where it was determined that it was unnecessary for the city to give the opportunity to voters to vote separately upon non-contiguous parcels of land being acquired by the city for parks under a statute empowering cities to secure them for park purposes. See also 122 S. W. 1008, State v. Miller, 26 Pac. 612, People *ex rel.* Mariposa County v. Counts, Treasurer.

So we conclude that the election was ineffective because not participated in by a majority of the qualified electors who were freeholders in the county at the time, and that one who was privileged to enter the election booth and indicate by the voting machine the nominees that he favored took no part in the election on the issuance of the bonds when he failed to take advantage of the opportunity to register his choice in that matter on the machine which was available to him for that purpose. By his negative act in refraining from voting, he deliberately manifested a desire not to take part in the bond election. Were we to hold otherwise, it would mean that those who did not wish to be recorded as participating in the bond election would be prevented from casting a ballot in the primary, because if they appeared in

the one they would be considered to have participated also in the other.

The ballot was valid.

It is ordered that the decree of the circuit court be— Reversed.

TERRELL, C. J., WHITFIELD, BROWN and BUFORD, J. J., concur.

CHAPMAN, J., agrees to conclusion.