STATE, H. T. LINEBAUGH, SR., *et al.*, v. CITY OF TAMPA

187 So. 604.

Opinion Filed March 11, 1939.

Rehearing Denied April 11, 1939.

*J. Rex Farrior,* State Attorney, *W. F. Himes* and *McKay, Macfarlane, Jackson & Ramsey,* for Appellants;

*Whitaker Brothers, Alonzo B. McMullen* and *Ralph A. Marsicano,* for Appellee.

PER CURIAM.—In the above styled cause Mr. Chief Justice TERRELL, Mr. Justice WHITFIELD, and Mr. Justice THOMAS are of the opinion that the decree of the Circuit Court should be reversed, while Mr. Justice BROWN, Mr. Justice BUFORD and Mr. Justice CHAPMAN, are. of the opinion that the said decree should be affirmed. When the members of the Supreme Court, sitting six members in a body and after full consultation, it appears that the members of the Court are permanently and equally divided in opinion as to whether the judgment should be affirmed or reversed, and there is no prospect of an immediate change in the personnel of the Court, the judgment should be affirmed, therefore it is considered, ordered and adjudged under the authority of State, *ex rel.* Hampton, v. McClung, 47 Fla. 244, 37 So. R. 51, that the judgment of the Circuit Court in this cause be and the same is hereby affirmed.

Affirmed.

TERRELL, C. J., and WHITFIELD, BROWN, BUFORD, CHAPMAN and THOMAS, J. J., concur.

CHAPMAN, J.—On August 24, 1938, the City of Tampa adopted Ordinance No. 686-A under the authority of Chapter 17118, Acts of 1935, Laws of Florida. The Ordinance provided for the construction by the City of Tampa of works for the collection, treatment, purification and disposal of sewerage; and providing for the issuance of sewerage revenue certificates by the City of Tampa in the sum of $2,934,000.00, payable solely from the sewer revenues for services furnished by the said sewer system. The area or territory to be served by the proposed Sewer-

age Works embraced the present territory within the limits of the City of Tampa, with additional contiguous areas within five miles from the corporate limits thereof outside of the city limits but not within any incorporated town or city.

The Ordinance provided:

"Section 1. * * *

"(a)   The immediate construction by the City of Tampa, Florida, (hereinafter sometimes called the City), of the following works for the collection, treatment, purification and disposal of sewerage (hereinafter sometimes called the Sewerage Works), is necessary for the protection of the health, safety and welfare of the inhabitants of the City and of the areas contiguous thereto hereinafter described;

(1)   Sewerage treatment plants.

(2)   Intercepting and trunk sewers and force mains approximately nineteen (19) miles in length.

(3)   Six (6) pumping stations.

(4)   Approximately seventy-seven (77) miles of lateral or collecting sewers. * * *

"The sewerage intercepting and transmission facilities comprise four divisions or systems, as follows:

(A)   The Hillsborough River System serving the central portion of the City and area contiguous thereto.

(B)   The Palm River System serving the eastern portion of the City and areas contiguous thereto.

(C)   The Davis Islands System serving Davis Islands.

(D)   The Ballast Point System serving areas contiguous to the western portion of the City.

"The Hillsborough River System includes intercepting and trunk sewers extending from a point near the Hills-

brough River at Louisiana Avenue southerly along the Hillsborough River to Krause Street, 'thence easterly to Grant Street and 20th Street, thence southerly to the treatment plant at Hooker's Point, together with syphons under the Hillsborough River and such other water courses as may be necessary, branch sewers to existing treatment plants, connections to existing sewers and other construction necessary or appurtenant thereto. A main sewerage pumping station will be located at the Hooker's Point treatment plant discharging the sewerage into the plant. A sewerage pumping station will be located in the vicinity of Krause Street and the Hillsborough River discharging sewerage into the intercepting sewer.

"The Palm River System includes intercepting and trunk sewers extending from a point near the junction of 42nd Street extended and the Seaboard Air Line Railway right of way, westerly to 22nd Street, thence southerly along 22nd Street to Grant Street, thence westerly to a connection with the Hillsborough River trunk sewer at Grant and 20th Streets. A sewerage pumping station will be located along the line of the sewer near 1st Street discharging into the intercepting sewer.

"The Davis Islands System includes a force main extending from a point near Severn Avenue between Potomac Avenue and South Davis Boulevard northeasterly across Davis Islands and the ship channel to the Hooker's Point treatment plant. A sewerage pumping station will be located at the head of the force main discharging into the force main.

"The Ballast Point System includes trunk sewers extending along the shore of Hillsborough Bay from Howard Avenue to Ballast Point with branch sewers on Bay to Bay Boulevard from Manhattan Avenue to Bayshore Boulevard, along Lisbon Avenue from Swann Avenue to Bay

Boulevard, along Swann Avenue from Himes Avenue to Armenia Avenue, and along Armenia Avenue from Grand Central Avenue to Swann Avenue. A sewerage pumping station will be located at the Ballast Point treatment plant discharging the sewerage into the plant. A sewerage pumping station will be located along the trunk sewer above Ballast Point discharging into the trunk sewer.

"Approximately seventy-seven (77) miles of lateral or collecting sewers will be constructed to collect sewerage from densely populated sections within and without the City and to convey sewerage to intercepting and trunk sewers. * * *

"(c) Application has been made to the United States of America to aid in financing the construction of the Sewerage Works by making a grant of Forty-five (45%) per centum of the cost thereof upon completion, as determined by the Federal Emergency Administrator of Public Works. * * *

"Section 4. For the purpose of providing funds for paying the cost of constructing the Sewerage Works in excess of the proceeds of any grant which the United States may make pursuant to the application above mentioned, there shall be issued under authority of Chapter 17118, General Laws of Florida, 1935, and subject to the election and the hearing hereinafter provided for, revenue certificates of the City of Tampa in the aggregate principal amount of Two Million Nine Hundred Thirty-four Thousand ($2,934,000) Dollars. Said certificates shall be designated 'Sewer Revenue Certificates' and shall consist of 2,934 certificates of the denomination of $1,000 each, numbered 1 to 2,934, inclusive. Said certificates shall be dated December 1, 1938, shall bear interest at the rate of four (4%) per centum payable semi-annually on the first days on June and December in each year, and shall mature

annually, December 1, in the order of their numbers, lowest number first, as follows:

| Year of Maturity | Principal Amount |
|---|---|
| 1941 | $ 60,000 |
| 1942 | 65,000 |
| 1943 | 65,000 |
| 1944 | 65,000 |
| 1945 | 70,000 |
| 1946 | 70,000 |
| 1947 | 75,000 |
| 1948 | 75,000 |
| 1949 | 80,000 |
| 1950 | 85,000 |
| 1951 | 85,000 |
| 1952 | 90,000 |
| 1953 | 95,000 |
| 1954 | 95,000 |
| 1955 | 100,000 |
| 1956 | 105,000 |
| 1957 | 110,000 |
| 1958 | 115,000 |
| 1959 | 120,000 |
| 1960 | 125,000 |
| 1961 | 130,000 |
| 1962 | 135,000 |
| 1963 | 140,000 |
| 1964 | 145,000 |
| 1965 | 150,000 |
| 1966 | 155,000 |
| 1967 | 160,000 |
| 1968 | 169,000 |

"The certificates of said issue shall be subject to redemption at the option of the City of Tampa in whole or in part,

on any interes: payment date prior to their respective maturities, at the principal amount thereof and accrued interest, together with a premium of one-fourth ($\frac{1}{4}$) of one (1%) per centum of the principal amount thereof for each twelve (12) months period or fraction thereof· between the date of redemption of each such certificate and the date of maturity thereof, provided that in no event shall such premium exceed five (5%) per centum of the principal amount, and provided at least ·.hirty (30) days prior to any interest payment date upon which such redemption is to be made a notice of intention to make such redemption, signed by the City Comptroller and stating the numbers of the certificates so to be redeemed, shall have been published. * * *

"Section 5. * * *

"This Certificate is one of a duly authorized issue of Two Million Nine Hundred Thirty-four Thousand (2,-934,000) Dollars Sewer Revenue Certificates, · all of like date and tenor; except as .o maturities, and issued or to be issued to provide funds for paying the cost of constructing works for the collection, treatment, purification and disposal of sewerage (herein called the Sewerage Works) and is issued under the authority of and in full compliance with the Cons.itution and laws of the State of Florida, including Chapter 17118, General Laws of Florida, 1935, and an ordinance duly adopted by the legislative body of said City, and the issuance of said certificates has been approved by a majority of the votes cast at an election legally called and held in which a majority of the freeholders who are qualified electors residing in said City of Tampa participated.

"Pursuant to the provisions of said Chapter 17118 and said Ordinance, the principal of and the interest of this certificate and all other certificates of said issue are payable solely from the Sewerage Works·Sinking Fund hereinafter

mentioned, created by said Ordinance, which Ordinance provides that the legislative body of said City shall fix and maintain rates for the services furnished by said Sewerage Works, which will provide revenues sufficient at all times to pay the reasonable expenses of administration, operation and maintenance of such Sewerage Works as are necessary to preserve the same in good repair and working order, and to pay the principal of and the interest on the certificates of said issue as the same become due and payable, and also provides for the payment into a special fund, which fund has been created by said Ordinance and designated 'Sewerage Works Sinking Fund,' of a sufficient amount of such revenues over and above such expenses of administration, operation and maintenance, which special fund is by said ordinance pledged to and charged with the payment of the principal of and the interest of said certificates. * * *

"Section 10. Rates for services furnished by said Sewerage Works shall be charged upon each lot or parcel of land, building, or premises having any connection with the sewer lines of the City on the basis of the quantity of water used thereon or therein as the same is measured by the water meter there in use, or in the absence thereof, by such equitable method as shall be determined by the Board. There shall be no free service rendered by the Sewerage Works and if the City or any department, agency or instrumentality thereof elects to avail itself of the services afforded by said Sewerage Works, it shall pay for the same at the established rates as the charges therefor accrue. * * *

"Rates charged for sewer service rendered to premises located outside of the city limits shall be ten (10%) per centum in excess of the rate set forth above.

"Rates charged for sewer service rendered to premises within the zone or area described in Section 3 of this ordinance, where connection is made to new laterals constructed

under the project proposed by this ordinance and for which no assessment has been heretofore assessed against the abutting property, shall be ten (10%) per centum in excess of the base rate set forth above. * * *

"Section 11. * * *

"(b) *Sewer Revenue Certificates Sinking Fund.*—A fund is hereby created and designated Sewer Revenue Certificates Sinking Fund (hereinafter sometimes called the Sinking Fund), which fund is hereby charged with and pledged to the payment of the principal of and the interest on all certificates issued under the provisions of this Ordinance. On or before the 10th day of each month after the completion of the Sewerage Works (and immediately after the transfer of moneys into the Operation of Maintenance Fund as above provided), it shall be the duty of the City Treasurer to transfer from the Revenue Fund into the Sinking Fund a proportionate part of the next installments of interest on and principal of the Sewer Revenue Certificates, as hereinafter more fully provided. The amount of each monthly transfer between the date of completion of the Sewerage Works and the first day of December, 1940, shall be sufficient to provide for the payment of the interest payable on or before that date. During the first five (5) years thereafter, the amount of such monthly transfer shall equal one-fifth (1/5) of the next maturing installment of interest and one-tenth (1/10) of the next maturing installment of principal; after December 1, 1945, the amount of each monthly transfer from the Revenue Fund into the Sinking Fund shall equal one-sixth (1/6) of the next maturing installment of interest and one-twelfth (1/12) of the next maturing installment of principal. In the event that the moneys in the Revenue Fund shall be insufficient at any time to make such transfers, any such deficiency shall be transferred into the Sinking Fund from the first

revenues of the Sewerage Works thereafter received and not transferred into the Operation and Maintenance Fund as above provided.

"It is the intent of the foregoing provisions of this Section that during the first five years after the 1st day of December, 1940, the amount so transferred into the Sinking Fund shall be in excess of the actual requirements for payment of principal and interest during such years. All such excess paid into the Sinking Fund from the above shall be held in the Sinking Fund as a reserve for contingencies. * * *

"Section 14. * * *

"In the event of a default in the payment of the principal of or interest on any certificates, which default shall continue for a period of sixty (60) days, the holder or holders of twenty (20%) per centum in principal amount of the certificates the outstanding shall be entitled as a strict matter of right to the appointment of a receiver, which receiver may enter upon and take possession of the Sewerage Works, operate and maintain the same, prescribe rates, and collect, receive and apply all revenues thereafter arising therefrom in the same way as the City itself might do. Unless the court shall otherwise direct, whenever all that is due upon such certificates and installments of interest and to any of the funds established pursuant to this ordinance shall have been paid and all defaults made good, said receiver shall surrender possession to the City, and the same right to a receiver shall exist upon any subsequent default. The foregoing provisions of this paragraph shall not be construed to limit the right of any holder of a certificate to apply for the appointment of a receiver in the discretion of the Court, nor to limit the rights or remedies of any holder of certificates or interest coupons under the Laws of Florida.

"Section 15. A special election is hereby called. to be held on Tuesday, September 27, 1938, for the purpose of submitting .o the qualified electors of the City of Tampa who are freeholders therein, the question whether said Sewer Revenue Cerᴸificates shall be issued under the provisions of this Ordinance, and the 'Board of Elections' of the City of Tampa is hereby requested to take all steps required of it by law in the conducting and holding of said elecᴸion. * * *

Ordinance No. 692-A recites that the election provided for in Ordinance No. 686-A was held on September 27, 1938, and the project duly approved by the necessary majority vote of the freeholders of the City of Tampa. This 'ordinance is a substantial reenactment of Ordinance No. 686-A coupled with the expressed determination that the City of Tampa should issue the Certificates and complete the project, with exceptions, viz.:

"In Section 1, Paragraph (i) it was reciᴸed that from a revised estimate of the cost of constructing the proposed sewerage works according to modified plans, such cost might not exceed $4,470,000.00, and in that event the amount of sewer revenue certificates to be issued should noᴸ exceed $2,459,000.00, and to Section 7 was added the following provision:

" 'Provided, however, that no sewer revenue certificates shall be issued in excess of such face amount as may be necessary, at the price to be paid therefor, to provide funds sufficient, together with the proceeds of the grant to be made by the Federal Emergency Administration of Public Works, ᴸo pay the cost as estimated by the consulting engineers of constructing the sewerage works according to the plans which shall be finally adopted by the board; and provided, further, that if all of said sewer revenue certificates shall not be delivered at one time, the certificates

of each installment shall consist so far as possible of a portion of the certificates of each maturity and the amount maturing in each year shall be so fixed that the total amount of the principal and interest of said sewer revenue certificates payable in each year shall be as nearly equal as practicable.'

"In Section 10 the rates were changed from the former ordinance but not the provision for 10 per cent increase outside the city limits and a like increase where connection was made to new laterals constructed under the project.

"In Section 14 changes were made with reference to collection of sewer charges and for the enforcement of delinquent charges as liens.

"The City obtained validation of its right to issue $2,-934,000.00 of certificates without any showing (which has not taken place) that any grant has been obtained from the United States or any other allocation of funds for the project, that any final plans have ever been adopted for the sewerage works or that the cost thereof is known or has ever been ascertained."

The City of Tampa filed in the Circuit Court Hillsborough County a petition under Section 5106, *et seq., C. G. L.*, to validate the sewer revenue certificates, making the State of Florida, citizens, residents and taxpayers of the City of Tampa, and citizens, residents and taxpayers residing outside of the City of Tampa but residing within the sewerage area, parties defendant. Pleadings were filed by the defendants, considerable testimony taken in the lower court on the issues made, and on final hearing the lower court found the equities of the cause in favor of the plaintiff below and entered a final decree validating the sewer revenue certificates. An appeal was taken and perfected to this Court and a number of assignments are presented and argued for a reversal of the final decree.

One of the first questions for consideration is:

"Where a municipality, under the authority of Chapter 17118, of the Acts of 1935, created a sewerage zone or area, which included the such municipality, to-wit: The city of Tampa, and extended and embraced contiguous territory extending, however, less than 5 miles from said City limits; the purpose being to improve and enlarge the existing sewerage works so as to create and establish a unified system for sewerage disposal in said zone or area; and where the certificates to be issued and obligation given is that of the municipality only, and said certificates do not purport to be an obligation on the part of the area or zone lying outside of the said City limits; so that under no circumstances could any taxes ever be levied or coerced on said area, embraced in said zone outside of said City limits, but any coercive action for taxation purposes would be confined entirely and exclusively against said municipality, under this condition, was it required under Section 6, Article IX, of the Constitution that the freeholders residing in said zone or area outside of said City limits of Tampa, be given the right to vote upon the question of the issuance of said certificates?"

The Sewer Revenue Certificates when issued became the obligations of the City of Tampa and in no manner or under any conditions or circumstances are they obligations of the area or territory lying outside of and contiguous to the City of Tampa. The City of Tampa at the present time owns a sewerage system but the same is inadequate to supply the demands of the people of the City of Tampa. The health of the people required the removal of existing septic tanks and numerous open toilets of said City. The sewerage system covering the area outside of the City of Tampa was in a poor state of repair and over a period of eight or ten years past had called upon the City of Tampa

for sewer clearing equipment and often made night calls for help. The raw sewerage through a trunk line emptied into the bay at Bay Shore Boulevard at a point where property was highly improved. The raw sewerage coming from West Tampa was emptied into Hillsborough River and the river and bay through the present system accommodated approximately 10,000 people, and the proposed system would eliminate these conditions. It cannot be disputed that the existing sewerage system will affect not only the people outside of and contiguous to the City of Tampa, but likewise the people now residing within the City of Tampa. The lower Court found from the evidence offered that the health of the people within the sewer area or territory will be affected if a change of the sewerage system as it now exists is not had or made. It is now wholly inadequate to meet the demands of the people of the affected area.

Paragraphs (b), (c), (d) and (e) of Section 1, Chapter 17118, Acts of 1935, provide:

"(b)   For the accomplishment of the purposes of this Act, any municipality is hereby authorized and empowered to execute its corporate powers within its corporate limits.

"(c)   Any municipality is hereby authorized and empowered to extend and execute all of its corporate powers applicable for the accomplishment of the purposes of this Act outside of its corporate limits, as hereinafter provided and as may be desirable or necessary for the promotion of the public health, safety and welfare or for the accomplishment of the purposes of this Act; provided, however, that said corporate powers shall not extend or apply within the corporate limits of another municipality.

"(d)   In the event any municipality desires to avail itself of the provisions or benefits of this Act, it shall be lawful for such municipality to create a zone or area by

ordinance and to prescribe reasonable regulations requiring all persons or corporations living or doing business within said area to connect, when available, with any sewerage system constructed, erected and operated under the provisions of this Act; provided, however, in the creation of said zone the municipality shall not include any area within the limits of any other incorporated city or village, nor shall such area or zone extend for more than five miles from the corporate limits of said municipality.

"(e) When it is proposed to exercise the powers granted by the Act, a resolution or ordinance shall be passed by the city council, or the legislative body of the municipality, by whatever name known, reciting the utility to be constructed or extended and its purpose, the proposed territory to be included, what mortgage revenue certificates or debentures if any are to be issued to finance the project, the cost thereof, and such other provisions as may be deemed necessary."

The lower court held that the sewerage revenue certificates do not directly or indirectly obligate the City of Tampa to levy or collect any form of taxation or to assume any obligations in connection with the issuance thereof, but the duty of the City of Tampa is to impose a sufficient charge for sewerage service rendered to patrons and customers in the sewerage zone or area using the system and when collected from the parons or customers, to pay the costs of operation, general maintenance repairs and to put the net revenues in a certain fund to be used by the City of Tampa for the retirement of the sewerage revenue certificates as outlined in the Ordinance, and this Court has held that it was not necessary for the freeholders to vote upon the question of the issuance of water and certain other types of revenue certificates as contemplated by Sec-

tion 6 of Article IX of the Constitution of Florida as amended in 1930.

In the case of State and Diver v. City of Miami, 113 Fla. 280, 152 So. 6, this Court approved the issuance of water revenue certificates on the part of the City of Miami where the proceeds were to be used to improve the water system of that City when the revenues were pledged to liquidate the water revenue certificates, and in the affirmance thereof this Court said:

"So the substance of what we decide in this case is that the contemplated certificates of indebtedness issued, or to be issued, by the City of Miami, which are payable out of the income of proprietary municipal property possessing a fixed earning capacity, to-wit: a municipal water plant, which said property is to be repaired, reconstructed and improved for the necessary preservation of the facilities of the plant, as well as the incidental protection of the public health and public safety, out of the proceeds derived from the sale of such certificates, and which certificates, according to their express phraseology, and according to the statutes and ordinances under which they are authorized and issued, are payable as to both principal and interest solely out of a special fund to be created and established out of the net earnings derived from the operation of said municipal water plant, which constitutes a net revenue derived and to be derived solely from the sale of water, and which certificates do not create, nor purport to create, a general obligation upon, or debt against, the city, and cannot be enforced or collected by levy of an *ad valorem,* or other municipally imposed tax upon property or business transactions situated, or carried on within said City of Miami, or make a charge of any kind upon the property of taxpayers, or upon the tax resource of the City of Miami, are not municipal bonds within the purview of Sec-

tion 6, of Article IX of the Constitution of the State of Florida, as amended in 1930, nor are they 'debts' of the city within the purview of the city's statutory debt limit. Such water revenue certificates are not held to be so exempt from the restrictions of the Constitution because they are designated as 'certificates' instead of 'bonds,' but because of the nature of the actual obligation created thereby, and the manner in which payment is to be made and enforced, as hereinbefore stated."

See: State v. City of Lake City, 116 Fla. 10, 156 So. 924; State v. City of Daytona Beach, 118 Fla. 29158 So. 300; Wilson v. City of Bartow, 124 Fla. 356, 168 So. 545; State v. City of Clearwater, 124 Fla. 354, 168 So. 546; State v. City of Punta Gorda, 124 Fla. 152, 168 So. 835; Leon County v. State, 122 Fla. 505, 165 So. 666; Tapers v. Pichard, 124 Fla. 549, 169 So. 39; Roach v. City of Tampa, 125 Fla. 62, 169 So. 627; Boykin v. Town of River Junction, 124 Fla. 827, 837, 169 So. 492; State, *ex rel.* City of Vero Beach, v. MacConnell, No. 1, 125 Fla. 130, 169 So. 628; Sharp v. City of Bradenton, 135 Fla. 604, 185 So. 346; State v. City of Clearwater, 135 Fla. 112, 184 So. 675.

It is next contended that (a) Chapter 17118, Acts of 1935, Laws of Florida, fails to grant the power or authority to the City of Tampa to enact Ordinances numbered 686-A and 692-A; (b) that the sewerage area or district is not embraced within Sections 5106 to 5110 C. G. L., and Section 6 of Article IX of the Constitution of Florida; (c) that emergencies cannot remove constitutional restrictions; (d) that the sewerage zone, area or territory is not within the meaning of Chapter 17118, *supra.*

The record shows the following: Dr. J. R. McEachern has been the Health Officer of the City of Tampa for seven years past and formerly lived for six years in Palma Ceia Subdivision outside of the City of Tampa but within the

sewerage district and is familiar with the entire sewerage zone, and that there exists some five or six thousand bucket surface privies within the area. The buckets are emptied into tank wagons and hauled across the City to a place on Osborne Avenue and dumped; that he was advised that the wagon leaked while going across the city; that privies are not safe from a health standpoint and that it is difficult to control the flies around the bucket privies. It was estimated that 7,500,000 gallons of sewerage from West Tampa was dumped daily into the river during the year 1928 and the estimate was made by the Florida State Board of Health and the United States Public Health Service; and that some private sewers run directly into the river and the bay. He testified: "I consider the present sewerage system a menace to the health of the community of Tampa. The pollution of the bay and river is a health menace, especially as to typhoid and dysentery, and from oysters and fish taken and consumed by the public from these waters. The odor arising from the bay coming from the raw sewerage is offensive and this occurs when driving down one of the principal boulevards of the City." The sewerage problem inside the city of Tampa and the outlying territory, but within the sewerage area have given the health authorities of Tampa deep concern for several years. If the proposed sewer system is installed it will remove the health menace. During the year 1931 some thirty or forty cases of typhoid in a month or six weeks developed in the outside area of the city which was traceable to oysters taken from the bay.

We have not been cited with authorities to show that the Legislature of Florida did not have or possess the power to enact Chapter 17118, *supra*. If legislative enactments are not contrary to some express or implied prohibition contained in the Constitution, the courts have no au-

thority to pronounce the enactments invalid. See: Thomas v. Williamson, 51 Fla. 332, 40 So. 831; State v. Bryan, 50 Fla. 293, 39 So. 929; Savage v. Board of Public Instruction, 101 Fla. 1362, 133 So. 341.

This Court has held by a long line of decisions that wide latitude out of necessity is granted or accorded the Legislature of Florida in the enactment of laws and there is a presumption that each enactment is constitutional and requires that a plain case of violation of the requirements of the organic law must be shown before a court will nullify statutes, or portions thereof. See: Rushton v. State, 75 Fla. 422, 78 So. 345; Smith v. Chase, 91 Fla. 1044; 109 So. 94; *Ex parte* Gilletti, 70 Fla. 442, 70 So. 446; State v. Vestel, 81 Fla. 625, 88 So. 477; Butler v. Perry, 67 Fla. 405, 66 So. 150 affirmed in 240 U. S. 328, 36 S. Ct. 258, 60 L. Ed. 672; Williams v. Dormany, 99 Fla. 496, 126 So. 117.

It will be observed that the objective here is to protect the health and safety of the people within the city limits of Tampa and those outside lying in areas contiguous to the city. The testimony is not disputed that the sewerage problem of these outlying districts is a menace to the health of the people residing within and outside of the City of Tampa. The sewerage system of the districts outside of the City of Tampa is in a low state of repair, requiring continuous repairs and is at all times dependent upon the City of Tampa. The disposal of the raw sewerage in the bay and the river constitutes a health menace and the responsibility of alleviating this condition is on the City of Tampa, which obligates itself to pay for the unified system and requires those residing outside of the City of Tampa to connect with the system and to pay a service charge. Liens are not assessed against property within or outside of the City, but residents are required to connect with the sewers and to pay for the service. The rule as to health

and sanitation regulation is well expressed by McQuillin on Municipal Corporations, Vol. 3 (2nd Ed.), par. 954, pages 119-122, viz.:

"954 (899). POWER TO MAKE AND ENFORCE. It is universally recognized that one of the chief purposes for the institution of municipal government is the conservation of the public health and safety. No more important obligation is confided to municipal corporations. Consistently with the United States Constitution a state may delegate to a municipality broad authority to determine under what conditions health regulations shall become operative, and in accordance with such power the municipality may vest in its officers wide discretion in matters affecting the application and enforcement of health laws.

"The nature of the ordinances and regulations that may be adopted and enforced for this purpose is largely discretionary with the municipal authorities. Under the usual charter powers to preserve the public health, and the like, ordinances designed to protect the legal community from infectious, contagious and pestilential diseases, from impure water, bad food, nuisances injurious to health and comfort, noxious odors and gases, unusual noises, etc., are uniformly liberally construed by the courts, and, unless clearly unreasonable and arbitrary, or demonstrably violative of some constitutional provision intended to protect the liberty of the individual or property rights, will be sustained.

"Within the power to preserve the public health is the power to create boards of health with authority to appoint officers and subordinates for this purpose; establish hospitals or asylums for the care of the sick or afflicted; promulgate reasonable regulations respecting the practice of medicine, surgery and midwifery (if charter power exists or the matter is not controlled exclusively by statute, which is

often the case) ; forbid bringing within the limits insane persons and paupers; provide for compulsory vaccination; prohibit the use of poison and adulteration in drugs, medicines, chemicals, and like matters; the adulteration of milk, bread and other food products sold within the city; and, generally, to prevent and abate all public nuisances which are or may become detrimental to the public health.

"Usually health officers are clothed under the law with summary powers to protect the people of a community against conditions which affect the health and lives of the locality. For example, forbidding under penalty having possession of or in use unclean receptacles in the transportation or delivery of milk or cream, or selling loose or dipped milk, or imposing as a condition for the issuance of a license to sell milk in the city the requirement of a blood test, to ascertain whether or not the proposed licensee may be a carrier of typhoid fever germs. The police power, as stated, is a power to prevent, a power to anticipate dangers to come, an active and earnest effort to protect the inhabitants of the community, and in so doing to restrain individual tendencies." ·

See Hutchinson v. City of Valdosta, 227 U. S. 303, 57 L. Ed. 520, 33 Sup. Ct. 290; District of Columbia v. Brooke, 214 U. S. 138, 53 L. Ed. 941, 29 Sup. Ct. 560.

The Legislature in the enactment of Chapter 17118, *supra,* intended to grant, give or confer on municipalities of Florida, in addition to the then existing general powers possessed or exercised by them under the laws of Florida, the authority to promote the public health, safety and welfare of the people residing in the municipalities of Florida or zones and areas so created or established, by the construction and maintenance of water works systems, sewerage systems, garbage collection and disposal plants, air ports, and gas plants, and to provide a method of financing

the same, the power to fix rates, the right of eminent domain, etc. Section 8 of Article VIII of the Constitution of Florida gives the Legislature the power to enact Chapter 17118, *supra*. See State v. City of Plant City, 127 Fla. 495, 173 So. 363; Davis v. City of Melbourne, 126 Fla. 282, 170 So. 836; State v. Town of River Junction, 125 Fla. 267, 169 So. 676; Hygema v. City of Sebring, 124 Fla. 683, 169 So. 366; State v. City of Clearwater, 135 Fla. 112, 184 So. 675.

Chapter 16462, Special Acts of 1933, Laws of Florida, created the Suburbs Beautiful Special Sanitary District and the same was amended by Chapter 17553, Special Acts of 1935, and further amended by Chapter 18899, Special Acts of 1937. Golf View-Parkland Special Sanitary District was created by Chapter 18551, Special Acts of 1937, and Virginia Park Special Sanitary District was created under Chapter 18594, Special Acts of 1937. These Special Sanitary District have powers and authority as therein enumerated and the objective of each Act, *supra*, being the installation, supervision, maintenance and operation of sewers for each sanitary district with the power to coerce the inhabitants of each to comply with the provisions of each Act regarding sanitation and health. These districts are contiguous to the City of Tampa and the sewerage system of each will be provided for by the sewer revenue certificates to be issued by the City of Tampa. It is contended by counsel for appellants that the Special Acts, *supra*, each create a public municipal corporation and not repealed by Chapter 17118, *supra*, and cite Sanders v. Howell, 73 Fla. 563, 74 So. 802; Stewart v. DeLand R. and B. Dist., 71 Fla. 158, 71 So. 42; American Bakeries Co. v. City of Haines City, 131 Fla. 790, 180 So. 524; Beasley v. Coleman, 136 Fla. 393, 180 So. 625.

Our study of these separate Acts convinces us that the

purpose or reason of their enactment was to protect the health of the people in each district by doing all things necessary to obtain or procure an adequate modern sewerage system. We fail to find any reasonable foundation to support the claim that these sanitary districts were and are municipal corporations within the meaning of the law. The lower court specifically held, from the evidence adduced, that the Suburbs Beautiful Special Sanitary District was not a public corporation as contemplated by Chapter 17118, *supra,* and there is ample evidence in the record to support this finding. See paragraphs (c) and (d) of Section 1 of Chapter 17118, *supra;* also Sections 3 and 4, Chapter 17118, *supra,* viz.:

"Section 3. Any municipality or private company organized for the purpose contained in this Act is authorized (1) to clean and improve street channels or other bodies of water for sanitary purposes; (2) to provide means for the regulation of the flow of streams for sanitary purposes; (3) to provide a water supply for domestic, municipal or industrial uses; (4) to provide for the collection and disposal of sewerage and other liquid wastes; (5) to provide for the collection and disposal of garbage; (6) and incidental to such purposes and to enable the accomplishment of the same, to construct reservoirs, sewerage systems, trunk sewers, intercepting sewers, pumping stations, wells, siphons, intakes, pipe lines, distribution systems, purification works, collection systems, treatment and dispossal works; (7) to construct, maintain and operate airports, to maintain, operate and repair the same and to construct and operate in addition thereto all machinery and equipment; (7-A) and to construct, operate and maintain gas plants and distribution systems for domestic, municipal and industrial uses; (8) and to construct such other buildings and facilities as may be required to

properly and economically operate and maintain said works necessary for the fulfillment of the purposes of this Act; provided, however, that a private company or municipality shall not construct any system, work, project or utility authorized to be constructed hereunder in the event that a system, work, project or utility of a similar character is being actually operated by a municipality or private company in the municipality or territory immediately adjacent thereto, unless such municipality or private company consents to such construction.

"Section 4. (a) All such reservoirs, sewerage systems, trunk sewers, intercepting sewers, pumping stations, wells, intakes, pipe lines, distribution systems, purification works, collecting systems, treatment and disposal works, and airports, gas plants whether heretofore or hereafter constructed or operated, are hereby declared to be and are considered a public utility within the meaning of any constitutional or statutory provision for the purpose of acquiring, purchasing, owning, operating, constructing, equipping and maintaining such works.

"(b) Whenever any municipality shall decide to avail itself of the provisions of this Act for the extension or improvement of any existing utility plant or system, any then existing plant or system may be included as a part of a whole plant or system and any two or more utilities may be included in one project hereunder. The revenues of all or any part of any existing plants or systems or any plants or systems constructed hereunder may be pledged to secure moneys advanced for the construction or improvement of any utility plant or system or any part thereof or any combination thereof."

See Duval County v. Charleston Lumber Mfg. Co., 45 Fla. 256, 33 So. 531, 60 L. R. A. 549, 3 Ann. Cas. 174; Forbes Pioneer Boat Line v. Board of Com'rs of Ever-

glades' Drainage Dist., 77 Fla. 742, 82 So. 346; State, *ex rel.* Landis, v. Town of Boynton Beach, 129 Fla. 528, 177 So. 327; People, *ex rel.* Mortell, v. Bergman, 253 Ill. 469, 97 N. E. 695; Hersey v. Neilson, 47 Mont. 132, 131 Pac. 30; Board of Directors v. Peterson, 64 Ore. 46, 128 Pac. 837, 129 Pac. 123; Memphis Trust Co. v. Board of Directors of St. Francis Levee Dist., 69 Ark. 284, 62 S. W. 902; Fitzgerald v. Walker, 55 Ark. 148, 17 S. W. 702; State, *ex rel.* Patterson v. Board of Comm'rs. of Douglas County, 47 Neb. 428, 66 N. W. 434.

Counsel for appellants contend that the lower court erred in the findings of fact: (a) that the special election held on September 27, 1938, for the purpose of submitting the question of approving the issuance of the certificates to the qualified electors of the City of Tampa who are freeholders therein was held in compliance with the requirements of Chapter 15533, Special Acts of 1931, and Chapter 14715, Acts of 1931, and the result of the election properly canvassed; (b) that the issuance of the certificates was approved at said election, and a majority of the freeholders who were qualified electors residing in the City of Tampa, Florida, participated in said election.

Exhibit "I" offered in evidence by the plaintiff below under Section 17 of Chapter 14715, Acts of 1935, was a finding as to the total number of votes cast in said election in favor of the approval of the bonds and the total number of votes cast in said election against the approval of the bonds, and the said certificates should be deemed *prima facie* evidence of the truth of the facts recited and shown, including the regularity of the calling, conducting and holding of the election at the time and place specified.

The certificate shows that 6,375 persons were qualified electors and freeholders of the City of Tampa and resided therein and were entitled to participate in the election held

September 27, 1938, and that at said election 3,238 persons entered the polling places and signed the registration books as a prerequisite for voting as required by law and actually entered the booths of the voting machines and participated in the election; that 1,846 freeholders voted for the issuance of the sewer revenue certificates and 1,215 voted against their issuance, while 177 freeholders failed to indicate their choice upon said question, although tabulating their participation in the election on the voting machines. The Board of Elections of the City of Tampa determined that a majority of those participating in said election voted for the issuance of the sewer revenue certificates. Witnesses were called and gave testimony as to the facts set up in the certificates and identified as plaintiffs' Exhibit "I."

The certificate shows 6,375 qualified electors and freeholders in the City of Tampa and entitled to participate in the election. Section 6 of Article IX of the Constitution, as amended in 1930, and Section 12 of Chapter 14715, Acts of 1931, Laws of Florida, required a majority of the qualified electors and freeholders to participate in said election, and 3,188 would be said majority. The record shows that 1,846 voted in favor of issuing the sewer revenue certificates and 1,215 voted against the issuance of the certificates and 177 went to the voting precincts on election day, received a blank ballot, entered the voting machine, and failed to make their desires known as to being for or against the issuance of the sewer revenue certificates, and from a careful study of the 177 ballots it is impossible to determine the intention of these voters on the issuance of the certificates. The question here is whether or not these 177 electors participated in the election within the meaning of Section 6 of Article IX of the Constitution and Section 12 of Chapter 14715, *supra*. It is clear that 177 freeholders and electors failed to cast a legal vote in the sense

that they could be counted for or against the issuance of the certificates. While the votes as deposited may not be votes entitled to be counted, but if the 177 voters should, after casting the ballots in question that could not be counted for or against the issuance of the certificates, return subsequently thereto during the same day and demand another blank ballot of the election officials, it is possible that a check of the election records on their part would show that the proposed voters had previously presented themselves, blank ballots had been given each, and told that they had each participated in the election during the same election day, and for this identical reason had exhausted their right as electors and freeholders to participate for the second time in the same election. If this Court should hold that an elector and freeholder who was given a blank ballot, entered the voting booth, but failed to cast a ballot that could be counted for or against the question in issue in an election and simultaneously hold that he had "not participated" in the election such holding would not be justified. If a voter owns property and is otherwise qualified to vote by having his name registered on the poll and registration books and on election day goes to the voting precinct, demands, and is given a blank ballot and signs the election books as kept by the election officials, then enters the voting machine for the purpose of casting his ballot, and thereby expressing his views on the issue for which the election was called and being held, as required by law, and by mistake, inadvertence, or some unknown reason his vote is deposited in such form and condition that it is impossible for the election officials to determine from this ballot his desire or intention on the issues submitted, it seems reasonable to conclude that the elector and freeholder has participated in the election. See City of Wellsville v. Connor, 91 Ohio St. 28, 109 N. E. 526;

Phelan v. Walsh, 62 Conn. 260, 25 Atl. 1; Attorney General, *ex rel.* Woodbury, v. Nickford, 77 N. H. 433, 92 Atl. 835; Lawrence v. Ingersol, 88 Tenn. 52, 12 S. W. 422; Murdoch v. Strange, 99 Md. 89, 57 Atl. 629; State, *ex rel.* Barrs, v. Pritchard, 111 Fla. 122, 149 So. 58.

It is next contended that the rates charged under Section 10 of Ordinance No. 692-A are a tax liability upon the real estate within the City of Tampa and the property and the rates are pledged for the payment of the sewer revenue certificates. The rates for sewer services are fixed in the Ordinance and shall be charged upon each lot, building or premises having sewer connections with the Sewerage Works of the City. The charge shall be based on the quantity of water used as measured by the water meter attached to the property, and if this method cannot be followed, some other equitable method shall prevail or be adopted by the City of Tampa, because no free sewer services shall be rendered by the Sewerage Works. If the rates prescribed are found upon trial to be oppressive or inequitable, the aggrieved party at a subsequent date can have such rates revised on proper proceedings by a court of competent jurisdiction. The price fixing feature of the Ordinance, *supra,* is sustained by par. (b) of Section 7 of Chapter 17118, *supra,* viz.:

"(b) The city council, or other legislative body of the municipality, by whatever name known, may establish just and equitable rates or charges to be paid to the municipality for the use of the utility by each person, firm or corporation whose premises are served thereby; and provided further, that if the charges so fixed are not paid when due, such sums may be recovered by the said municipality by suit in a court having jurisdiction of said cause or by discontinuance of service of such utility until delinquent charged for services thereof are paid, including

charge covering any reasonable expense for reconnecting such service after such delinquencies are paid, or any other lawful me.hod of enforcement of the payment of such delinquencies."

We have given careful consideration to each assignment and fail to find error in the record. The judgment appealed from is hereby affirmed. It is so ordered.

BUFORD, J., concurs.

BROWN, J., concurs specially.

TERRELL, C. J., and WHITFIELD, and THOMAS, J. J., dissent.

BROWN, J., (concurring specially in the opinion of Mr. Justice CHAPMAN.)—The controlling question in this case, it seems to me, is whether the 177 qualified freeholder electors who entered the polls, went into the voting machine booths, where they had the full opportunity to vote, but went out without having voted, may be considered as having "participated" in the election within the meaning of Section 6 of Article IX of the Constitution.

This question is a close and difficult one, but, not being clearly convinced that the trial court was in error in its decision of this question, which is cogently supported by Mr. Justice CHAPMAN's opinion, I think we should resolve the doubt in favor of the trial court's decree to the effect that these 177 electors did as a matter of fact participate in the election, even though they did, in effect, cast blank ballots. There is no charge that any fraud or lack of bona fides was involved in any way.

I agree with Mr. Justice WHITFIELD and Mr. Justice THOMAS that an *election* was necessary to give validity to these proposed sewerage revenue certificates. I am inclined to the view that in constructing and operating a sewerage system the municipality is exerting its police or

governmental powers as distinguished from its corporate or proprietary powers, and that whatever form of charge or rent which it may impose upon its citizens who connect their property with and receive the benefit of such system is but a form of taxation, and that the imposition and collection of such so-called service charges is an exercise of the taxing power which the citizen or property owner cannot avoid, because the making of such private connections with the sewerage system and the payment of such charges are made compulsory upon the citizen or property owner. He has no option to refuse or discontinue the service, such as he may exercise with regard to electric light, telephone and water service. But I realize that there are strong authorities to the contrary, which take the position that such sewerage charges are not taxes, but mere charges for service rendered.

Whether these compulsory features of the ordinances and the legislative act under which they were drawn could be enforced against possible objecting property owners in the area outside the City is a question which I do not think we are called upon to decide in this case. We are dealing here with the validity of certain proposed revenue certificates which constitute obligations of the City of Tampa alone. So I think the question of the power of the City to *compel* the making of sewer connections with its proposed extension of its system in territory out-side the City, and to enforce the payment of charges therefor, while it may be pertinent to the matter of the value in part of the security pledged for the payment of the certificates, does not vitally affect the validity of such certificates as obligations of the City of Tampa. It is therefore a mere collateral question in this case, and we have frequently held that in reviewing validation decrees this Court will not consider or decide mere collateral questions. The general question of

the power of the legislature to authorize a municipality to extend its sewerage system to communities adjacent to, but outside, the municipal territorial limits, is *not* collateral here, because obligations of a municipality can only be made for a lawful municipal purpose. I think the legislature had the power to authorize municipalities to make such extensions. It may be essential to the health of a city to exercise such a power.

While this case presents several close and difficult questions, which have given great concern, I am not convinced, in spite of the very able argument of distinguished counsel for appellants, that the lower court's decree, holding the proposed certificates to be valid obligations of the City of Tampa was erroneous. I concur therefore with Mr. Justice CHAPMAN that the decree of the court below should be affirmed.

BUFORD, J.—I concur in the opinion prepared by Mr. Justice CHAPMAN in this cause and append hereto Memorandum of authorities amply sustaining the views expressed by him as to two important questions presented.

### MEMORANDUM

MAY A MUNICIPALITY BY LEGISLATIVE ACT BE AUTHORIZED TO LAY SEWERS THROUGH DESIGNATED ADJACENT TERRITORY, THICKLY POPULATED?

In McQuillin on Municipal Corporations (2d Ed.) Vol. 4, Sec. 1551, p. 312, the following rule is found:

"It is usual for municipal charters, or legislative acts applicable, to provide for the construction of sewers which extend or drain territory beyond the corporate limits."

In 20 Am. & Eng. Encyc. of Law (2d. Ed.), p. 1148, it is said:

"It has been held that the authority of a city to act beyond its boundaries may be implied on the ground of a

special necessity, as in preserving from deposits of filth a stream which bounds the city, or conducting sewers and drains out of the city, and the like."

In 44 C. J., Municipal Corporations, Sec. 4001, p. 1084, it is said:

"While the general rule is that municipal corporations may exercise their corporate limits, they are sometimes expressly authorized to go beyond such limits for drainage or sewerage purposes."

The court, in Board of Supervisors of Henrico County v. City of Richmond, 162 Va. 14, 173 S. E. 356, said:

"In Dillon on Municipal Corporations, vol. 1, Sec. 237, (5th Ed.) it is said:

" 'It is a general and undisputed proposition of law that Municipal corporations possess and can exercise the following powers and no others:

" 'First: Those granted in express words;

" 'Second: Those necessarily on fairly implied in or incident to the powers expressly granted;

" 'Third: Those essential to the declared objects and purposes of the corporation—not simply convenient, but indispensable. Any fair, reasonable, substantial doubt concerning the existence of the power is resolved by courts against the corporation, and the power is denied. * * * '

"Section 19 of the charter of the city of Richmond authorizes the city council to enact suitable ordinances to secure and promote the general welfare of the inhabitants of the city, by them deemed proper 'for the safety, health, peace, good order, comfort, convenience and morals of the community.'

"It would seem to be 'not simply convenient, but indispensable,' for a city to possess the power to contract for the disposition of the sewerage of a thickly settled com-

munity just on its borders to the end of the promotion of the health of the inhabitants within its corporate limits."

MAY A MUNICIPALITY REQUIRE PROPERTY OWNERS RESIDING IN SUCH ADJACENT TERRITORY TO CONNECT WITH AND USE THE SEWER SYSTEM FOR SANITARY PURPOSES FOR THE PROTECTION OF HEALTH OF THE MUNICIPALITY?

44 C. J., Municipal Corporations, Sec. 4004, p. 1086, sets out the following rule:

"The ownership of public sewers being in the municipality property owners have no right to make connections with a municipal sewer without the consent of the municipality but the municipality may permit them to make such connections or in the interest of the public health and welfare, it may require them to do so."

In Hutchison v. City of Valdosta, 227 U. S. 303, 33 S. Ct. 290, 57 L. Ed. 520, an ordinance adopted under legislative authority by an inland town containing less than 6,000 inhabitants, by which the owners of property abutting upon any street along which sewer mains had been laid were required to install water-closets in their house, and connect the same with the main sewer pipe within thirty days from the passage of the ordinance, under penalty of fine and imprisonment for noncompliance, was held to be a valid exercise of the police power. The court said:

"It is the commonest exercise of the police power of a state or city to provide for a system of sewers, and to compel property owners to connect therewith."

In holding that the legislature might confer power on a municipality to compel owners of property abutting on a street in which a sewer was laid to make connections therewith, the court, in Allman v. Mobile, 162 Ala. 226, 50 So. 238, said:

"No police power is more important than that to adopt such sani ary regulations as may be necessary to insure the safety and preserve the health of the inhabitants of a city. Nor do we doubt that the maintenance of an efficient sanitary sewerage system is of prime importance in encompassing the ends sought by the delegation of such power; and surely no sewerage sys.em could be regarded as efficient without the incident of power in the municipal corporation to compel connections of property by its owners with the system. So, on principle and authority, we hold it to be within legislative compdency to confer on municipal corporations the power to compel such connections. Bliss v. Kraus, 16 Ohio St. 54; Village of St. Mary's v. Railroad Co., 60 Ohio St. 136, 53 N. E. 795; Railroad Co. v. Sullivan, 32 Ohio St. 152; Health Department v. Rector, etc., 145 N. Y. 32, 39 N. E. 833, 27 L. R. A. 710, 45 Am. St. Rep. 579; Bancroft v. Cambridge, 126 Mass. 438; Commonwealth v. Roberts, 155 Mass. 281, 29 N. E. 522, 16 L. R. A. 400."

The reasons for sustaining the right to compel such connections are well stated in the case of Spear v. Ward, 199 Ala. 105, 74 So. 27, as follows:

"As before stated, one of the most important objects of municipal government is the preservation of the public heal.h; and science has demonstrated that nothing contributes more to secure the end than a sanitary system of sewerage and water-closets connected therewith; and the benefits of such a system are largely lost unless the inhabitants of the city can be compelled to connect their premises with the system, and to abandon dry closets and install water-closets. To this end the Legislature has clothed municipalities with the power and authority to pass ordinances, by-laws, etc. The municipal authorities to this extent exercise the police power of the state; and they not

only have the power, but the law enjoins the duty and obligation on them to promptly abate or remove all nuisances by which the public health may be affected, and to thus provide for the safety, comfort, and convenience of the inhabitants. All the inhabitants therefore have an interest in seeing that proper ordinances are passed, as well as that, when passed, such ordinances are enforced against all, as the failure to conform thereto by a few may inflict injury and ill health upon the many."

In an Annotation entitled "Power to Compel Connection of Property with Public Sewer," L. R. A. 1918C, p. 258, the following rule is found:

"The rule is well established that the enactment of statutes and ordinances compelling owners to connect their property with public sewers is within the police power, and that the validity of such legislation will be sustained; at least unless under the particular circumstances it is plainly unreasonable or arbitrary. And the fact that the existing sanitary arrangements may have been made under legislative authority or compulsion does not apparently affect the application of the rule."

In support of this rule cases are cited from the United States Supreme Court, Alabama, New Jersey, Massachusetts, Missouri, New York, Pennsylvania and Rhode Island.

In a Note found in Ann. Cas. 1913D, 61, 64, it is said:

"A municipality duly authorized by law to construct sewers and to compel property owners to connect therewith may require property owners to do so and may enforce the performance of that duty by necessary and reasonable ordinances. Allman v. Mobile, 162 Ala. 226, 50 So. 238; Van Wagoner v. Paterson, 67 N. J. L. 455, 51 Atl. 922: Lower Merion Tp. v. Becker, 42 Pa. Super. Ct. 203; Harrington v. Providence, 20 R. I. 233, 38 Atl. 1, 38 L. R. A.

324. See also Hill v. St. Louis, 159 Mo. 159, 60 S. W. 116; *In re* McCutchon, 22 U. C. Q. B. 613. In Van Wagoner v. Paterson, *supra*, the court said: 'The requirement for connecting dwellings, or for the preparation for the connection of prospective dwellings, or other buildings to be occupied by persons, with a sewer in a highway, is an important sanitary regulation in cities in these modern days, and essential to the public good and the preservation of the public health. It is within the power of the local authorities, under our health laws, to require sewers to be built in streets and to compel connection therewith, at the expense of the abutting owner, and to cause the removal of cesspools and the like from abutting premises. The right to pass and enforce ordinances for these purposes is frequently authorized by statute, and is a part of the police power of the state for the preservation of the public health, and has never been questioned.' "

In Malone v. Quincy, 66 Fla. 52, 62 So. 922, Ann. Cas. 1916D, 208, the holding that an ordinance of a municipality, which in effect prohibits the maintenance of any open surface closets or privies in a certain area, is unconstitutional, is based on the ground that the state has conferred on the particular municipality the express right to regulate the location of earth closets and privies and that in so far as the municipality attempts to prohibit their use it is acting without authority.

MAY A MUNICIPALITY REQUIRE A PROPERTY OWNER USING THE SEWER SYSTEM TO PAY A REASONABLE FEE THEREFOR AND IN DEFAULT OF SUCH PAYMENT MAY THE MUNICIPALITY HAVE A LIEN ON THE PROPERTY SERVED FOR THE REASONABLE FEE CHARGED?

In Robertson v. Zimmerman, 268 N. Y. 52, 196 N. E. 740, an Act of the legislature authorized the mayor of Buf-

falo to appoint a board known as "Buffalo Sewer Authority" which was to have control of existing sewer system and authority to construct additional sewers. One provision of the act authorized the board to establish sewer rents to be collected from all real property served by its facilities. Such sewer rents were to constitute a lien on the real property served. A taxpayer brought an action to secure a permanent injunction restraining the mayor from appointing the board. The Supreme Court, in affirming a decree rendered in favor of defendant, said:

"The act provides that the Authority is permitted to charge only on a basis of service rendered. Charges based upon services rendered by an authority do not constitute a tax, and the fact that a lien for unpaid charges is permitted against the property served does not affect the validity of the Act."

"Those improvements are necessary because the city has created a menace which must be eliminated if the public health and welfare of the people of the State are to be protected and the users of the system, who will be benefited thereby, must provide the most of the improvements. Since the city cannot itself meet the requirements of the situation, the only alternative is for the state, in the exercise of its police power, to provide a method of constructing the improvements and of financing their cost. The statute in question affords an equitable and proper method of accomplishing such a result."

In Grim v. Village of Lewisville, 54 Ohio App. 270, 6 N. E. (2nd) 998, an ordinance imposed a sewer service charge and provided that such charge should constitute a lien upon the property served. Plaintiff is attempting to enjoin the city from prosecuting an action brought for delinquent rentals, contending that the charges for sewer service assessments against the lands of plaintiff are wholly unlaw-

ful, illegal and void. The court in rendering a decree for defendant said:

"Upon an examination of the petition in the instant case, and applying the law to the same for a proper disposition of the demurrer to the petition, we have to say that the case in issue involves no special assessments whatever. In the present case the village of Lewisville is attempting to enforce, not a tax, not an assessment, not a special assessment, but a rental especially by Section 3891-1, General Code, partaking of the nature of a tax or assessment. No particular improvement involving a special assessment is provided for or adopted. The village simply proposes to avail itself of a statutory right to maintain and operate a sewerage system constructed nearly twenty-five years ago."

WHITFIELD, J.—Section 6 of Article IX of the Florida Constitution as amended in 1930 contains the following:

"Municipalities of the State of Florida shall have power to issue bonds only after the same shall have been approved by a majority of the votes cast at an election in which a majority of the freeholders who are qualified electors residing in such * * * municipalities shall participate."

The provision is organic and has direct and express reference to "vote cast" in an "election" by qualified freeholder electors and not to votes attempted to be cast, but which votes are so marked as not to be entitled to be counted as "votes cast" in the "election" upon the question at issue.

A legally qualified voter who attempts to vote but fails to properly mark the ballot deposited or released by him or her so that it may legally be counted for or against the matter at issue, should not be permitted to again attempt to vote because the law does not contemplate a second attempt to vote at the same election, but such futile or abor-

tive attempt to vote is not a participation in the "votes cast" in the "election" as is mandatorily required by Section 6, Article IX, as quoted above. A blank or improper vote is not among the "votes cast" in the "election" within the purpose and meaning of the quoted section of the Constitution.

In order to have a valid election, the quoted section of the Constitution mandatorily requires "a majority of the freeholders who are qualified electors residing in such municipality," to vote at the "election," and that "a majority of the votes cast" shall determine the result. Only qualified freeholder electors are allowed to vote at such an election.

The fundamental purpose of the constitutional requirement is that a majority of the qualified freeholder electors residing in the municipality shall cast at the election, votes which legally should be counted either for or against approving the issuance of bonds, and that when such a majority have cast votes which should be counted, "a majority of the votes cast," shall determine the issue for which the election was held. The one hundred and seventy-seven blank or defective votes improperly cast which could not legally be counted either for or against approving the bond issue, should not be counted in determining whether a majority of the qualified freeholder electors residing in the municipality did legally "cast votes" in the "election," as required by the imperative provisions of the quoted section of the Constitution which was designed to protect the citizens in the process of issuing evidences of public indebtedness. See County of Leon v. State, 122 Fla. 505, 165 So. 666.

Those whose property is covered by the ordinance and is located outside of the city limits are *"required"* to connect with the sewer system, and the charges therefor *may*

*be enforced and are to be used in paying the certificates of indebtedness,* though such certificates are issued as obligations of the city only; and as there was no approving election held beyond the city limits, the issuance of the certificates which are in effect bonds, and the "required" burden and continuing charge expressly imposed for sewer connection and service, such charges to be used in paying the certificates which are in legal effect bonds, without an approving election in such territory, necessarily operate as an indirect but very material violation of amended Section 6, Article IX of the Constitution, as to the area beyond the city limits.

The sewer connections into private property become a part of the realty. The private property may be adjudged a nuisance for failure of the owners to make and maintain the sewer connections, Section 3 of Ordinance No. 686A the charges for the sewer connections and use may be enforced and are to be used to pay certificates that are in effect thirty year bonds to be issued without an approving election in the area outside the city limits. This violates Section 6, Article IX of the Constitution. See Williams v. Town of Dunnellon, 125 Fla. 114, 169 So. 631; Kathleen Citrus Land Co. v. City of Lakeland, 124 Fla. 659, 169 So. 356; Boykin v. Town of River Junction, 121 Fla. 902, 164 So. 558.

THOMAS, J. (concurring with Judge WHITFIELD).—It was said in Boykin v. Town of River Junction, 121 Fla. 902, 164 South. Rep. 558, and reiterated in Spearman Brewing Co. v. City of Pensacola, not yet reported, that the decisions of this court are in harmony with cases holding:

"That, to permit a public corporation to borrow any money under a contractual device of its repayment with interest, even though it is expressly provided therein that

the municipality will not be liable generally for its repayment, but that the lender shall look solely to pledged municipal property or assets, or the income thereof, as security, in effect annuls an intended constitutional debt creation restriction such as that to be found in our amended Section 6 of Article IX of the Florida Constitution, and is therefore void as an indirect scheme designed to strike down an intended constitutional safeguard against municipal profligacy." 164 South. Rep. 561.

The exception to the rule is the doctrine set out in State v. City of Miami, 113 Fla. 280, 152 South. Rep. 6, where it was held that if the city owned a water system in its *proprietary* capacity it could issue anticipated certificates payable from a fund to be replenished from anticipated revenues.

We think that activities of a city in its proprietary capacity cannot be confused with the functions it exercised by virtue of its police powers.

The instant case proceeds upon the theory that for the protection of the citizens living in the city of Tampa the outlying citizens should be required to connect with the sewer line and that if they fail to pay for the service rendered by the city in extending the line their property may be sold to satisfy a lien therefor. An election was held within the city, but no opportunity was afforded those in the area outside the city limits to cast a ballot.

It is not argued that the city is acting in a proprietary capacity and that no election was required, but that to meet the constitutional inhibition a ballot was necessary within the city but unnecessary without.

We cannot see how the exercise of the police power by the construction of a sewer line and a forced connection with it and the sale of property to satisfy liens for con-

necting charges can be considered consistent with the privilege which the city enjoys in a corporate capacity.

Because of the compulsory and lien features, and not doubting the right of the city to do what it attempts as an exercise of police power, we think the decree validating the certificates should be reversed. A municipal corporation does not invoke police power while acting in a proprietary role.

The amendment to the Constitution (Sec. 6 of Art. IX) gives the power to issue bonds only after the issuance has been approved "by a majority of the votes cast in an election in which a majority of the freeholders who are qualified electors * * * shall participate."

In the election under question here there was 6179 qualified voters, of whom 1846 voted affirmatively, 1215 cast a negative ballot and 177 entered the machines but did not register a choice. If the 177 can be said to have participated the issuance of the certificates was approved. If the 177 are ignored then but 3061 of 6179 qualified voters took part and the election must fail.

We think the latter position correct. It was, in our opinion, the intent of the legislature that there would be authority for bonds only when a majority of a majority sanctioned the indebtedness and that it was not anticipated that among those voting would be counted the ones who appeared at the polls but indicated no choice one way or the other.

TERRELL, C. J., and WHITFIELD, J., concur.